CHARLES H. BALDWIN and Others, as the MILK CONTROL BOARD OF THE STATE OF NEW YORK, Plaintiffs, *v.* DELLWOOD DAIRY CO., INC.; Defendant.

CHARLES H. BALDWIN and Others, as the MILK CONTROL BOARD OF THE STATE OF NEW YORK, Plaintiffs, *v.* JOHN B. ROSASCO, Administrator, etc., of JOHN E. ROSASCO, Deceased, Defendant.

Supreme Court, Albany County, March 16, 1934.

*Henry S. Manley*, for the plaintiffs.

*Hays, Wolf, Kaufman & Schwabacher* [*Solomon I. Sklar* and *James M. Grossman* of counsel], for the defendant Dellwood Dairy Co., Inc.

*Ransom H. Gillett* [*Walter J. Carlin* of counsel], for the defendant John B. Rosasco, as administrator, etc.

HINMAN, Official Referee. The Milk Control Law (Laws of 1933, chap. 158; Agriculture and Markets Law, art. 25) was enacted April 10, 1933. Its ultimate purpose was to improve milk prices to producers. Its constitutionality has been sustained. (*People* v. *Nebbia*, 262 N. Y. 259; *Nebbia* v. *People*, 290 U. S. ——; 54 S. C. R. 505.) The provision directly involved in that case was the minimum price to the consumer as fixed by the Board. The present cases directly involve the minimum price structure fixed by the Board

as to producers who sold to New York city dealers, who in turn sold to stores and restaurants in said city. The constitutionality of the statute itself or any of its provisions is not seriously questioned by the defendants. It is the validity of price-fixing orders of the Milk Control Board that is directly attacked. In general, their contentions are three-fold: (1) That the orders were not issued in conformity with the requirements of the statute and were null and void; (2) that the orders (32, as amd. by 34) fixing a minimum price to producers are unconstitutional and void and contrary to the statute itself because the defendants could not pay a price so high and add to it their necessary costs of operation and sell their product to stores and restaurants at a sum equal to their total costs when required to charge to such stores and restaurants the minimum price fixed by the Board therefor (order 35), which because of market competition became the maximum price obtainable; and (3) that the orders (32 and 34) fixing minimum prices to producers are rendered invalid, confiscatory, arbitrary and discriminatory because the statute makes them conditional upon the Board fixing minimum prices upon resales, and the Board has recently annulled its order 35 so far as it fixed prices upon sales from dealers to stores and restaurants in New York city.

*First.* It is urged that the Board, before making orders 32, 34 and 35, failed to make the investigation required by the statute and failed to give the reasonable notice required thereby; and that the investigations made and hearings held by the Board failed to justify the prices fixed in said orders; and that the said orders were not issued pursuant to the requirements of the statute and were null and void. .

The presumption is that the Board did its duty in the emergency efforts required of it in the making of investigations, giving notice of hearings, conducting the hearings and making such orders. Such presumption was not overcome so far as the original validity of such orders was concerned. The Board had the benefit of the voluminous and carefully prepared report of the joint legislative committee to investigate the milk industry (known as the Pitcher report) which recommended this emergency legislation. The Board had been investigating for three months and had held a number of hearings and had issued a number of orders before the hearing of July 14, 1933, after which orders 34 and 35 were promulgated, effective July 21, 1933. The statute (§ 312-f) provides for reasonable notice to all parties interested and to the public of a hearing before making an order fixing prices, such notice to be given " in such newspaper or newspapers as in the judgment of the Board shall afford sufficient notice and publicity." This hearing of July

fourteenth was for the purpose of "supplementing, altering, revising and/or amending any and all official orders heretofore promulgated" and was so noticed on July eleventh by posting in the main office of the Board and by news release to the press. Considering the fact that over 3,000 milk dealers in the State, besides producers and consumers, were parties interested, it does not seem to me that the judgment of the Board was arbitrary or unreasonable in relying upon such posting and news release rather than mailed notice or paid advertisement. The newspapers in their news items have given considerable publicity to the activities of the Board. The hearings have been largely attended and the one of July fourteenth was so largely attended that it was removed to Chancellor's Hall. There is no evidence that these defendants or any other milk dealer ever complained about lack of advance notice of the hearing of July fourteenth or of any other hearing of the Board. Whether the hearing of July fourteenth failed to justify the prices fixed in orders 34 and 35 should not be determined upon the record of the hearing alone. The Board had before it the data of its own investigations and moreover its orders could have been reviewed by certiorari, which was not done. At most the courts could hold only that the Board acted arbitrarily or capriciously. They could not substitute their judgment for that of the Board. I cannot say that the Board acted arbitrarily. These two orders were essentially related and were two parts of a plan to raise the resale price of milk one cent a quart and raise the price of milk to be paid producers about three-quarters of a cent a quart, leaving the difference of one-quarter of a cent a quart to milk dealers, intended to compensate them for additional labor costs anticipated as a result of NRA activities. The defendants, and other milk dealers generally, availed themselves of the increased minimum resale prices fixed by order 35. As eventually disclosed, however, the spread of prices was insufficient to permit the defendants and other dealers similarly situated to meet their operating costs. Even the expert investigator of the Board reported to it in October that such was the case with twenty-two out of thirty dealers surveyed in the metropolitan area. There were certain factors, however, which may account materially for the discrepancy between the forecasting judgment of the Board in making the orders and the experience of the dealers thereunder. There was a milk strike in August. The increased costs due to NRA, beginning September first, were much larger than anticipated. There was a seasonal decline in the volume of fluid milk consumption in the last months of the year. Competition between dealers in New York city, particularly in efforts to dispose of surplus milk to stores and

restaurants and others, became so keen and destructive through secretive price-cutting that the defendants and many other dealers, who endeavored to observe the orders of the Board, lost a large volume of store and restaurant business. The Board, with the help of an organization of metropolitan area dealers, endeavored to correct these abuses and violations but found far more difficulty in the enforcement of its prices for resales from dealers to stores and restaurants in New York city than in other cities or other schedules of prices in New York city. Under these circumstances only a few of the largest dealers seem to have been able to operate at slight profit above total operating costs and then only because they had the facilities to dispose of surplus milk for other than fluid consumption for which they became entitled to a lesser price adjustment with their producers under the classified price plan adopted by the Board. Under that plan the producers were paid according to the utilization of their milk by the dealer who purchased from them. If used for butter, cheese or ice cream, the proportions so used were paid for at a lower price than if used for fluid milk consumption. The defendants were engaged mostly in sales to stores and restaurants and to other dealers and were not equipped with facilities of their own to manufacture such products as butter, cheese or ice cream. The problem is intricate and in all price-fixing much depends upon the ability and willingness of the consumer to pay to the extent to which the Board might otherwise raise the whole price structure in order to produce a fair return to the producers and the dealers and the stores and others who sell to the ultimate consumer. All of these circumstances have a decided bearing upon the question whether the Board acted arbitrarily in fixing the prices which it did in orders 34 and 35 in July. And whatever may have been the ultimate effect, it cannot be said upon this record that the orders when made were arbitrary or otherwise invalid.

*Second.* The second contention of the defendants deals with the validity of order 34 (fixing minimum prices to producers) in its relation to order 35 (fixing minimum resale prices to be charged by dealers to stores and restaurants).

It was impossible apparently for the defendants or for other milk dealers to sell milk at a greater price than the minimum prices set by order 35 and the minimum prices became and in fact were the maximum prices obtainable by defendants and other dealers for their brands of milk. From August 1, 1933, to the present time the defendants have made no profits and have on the contrary consistently lost a substantial sum of money. During that period the defendants lost considerable store business because the prices

charged by them were the minimum prices set by the plaintiffs. This was apparently due to secretive price-cutting by other dealers. Other dealers engaged in a business similar to that of the defendants in New York city, and buying and selling at the prices fixed by the Board, and operating efficiently and economically, have lost substantial sums of money. It was definitely proven at least as to the defendant Dellwood Dairy Co., Inc., that it had operated efficiently and economically. The difference between the prices fixed by order 34 by the Board to be paid to producers and the resale prices for the sale of milk to stores and restaurants and to consumers in New York city, as fixed by order 35, was insufficient to cover the cost of operating such business by defendants and said other dealers. The difference between the prices fixed by order 34 and the highest prices obtained or obtainable by defendants and others similarly situated in New York city (selling unadvertised brands to stores and restaurants or consumers) was insufficient to cover the cost of operating such business by defendants and said other dealers. Sales from dealer to dealer other than to a " store " are not covered by order 35. Section 301 of the Milk Control Law defines " store " to mean " a grocery store, hotel, restaurant, soda fountain, dairy products store and similar mercantile establishment." The Board never has fixed a specific price applicable to sales between milk dealers (other than between dealer and " store "). It has, however, by order 33, attempted to prohibit generally the regular and continuous sale below cost of fluid milk or cream to be utilized as such (class 1 or class 2-a milk). The defendants do not claim that this order has been in any way responsible for their predicament. In fact they disclaimed any appreciation of its applicability to their dealer to dealer business as operated by them. It is difficult to see in fact how order 33 could be either helpful or harmful to the defendants so far as their ability to operate at a profit is concerned. If, as shown, the class 1 and class 2-a milk market in New York city was so over-supplied as to lead to cut-throat and destructive price-cutting by unscrupulous dealers, it is difficult to see how the defendants and others similarly situated could hope to make a profit in dealer to dealer sales of those classes if they paid their producers a price based upon utilization as class 1 or class 2-a milk or cream. A considerable part of the operating losses of the defendants is claimed to be due to loss of dealer to dealer business. It is not clear whether or to what extent this was a loss of class 1 or class 2-a business, but if so, under their market conditions for such classes of milk, the more they sold the greater would be their business losses. Their only other outlet for their surplus was to sell for manufactured products, in which event they could pay their

producers to that extent a lower price fixed in order 35. Apparently they were not equipped to do such manufacturing themselves and were unable to sell for such purposes to such an extent or with such profit as to permit them to overcome their losses in sales to " stores " and consumers at the Board prices fixed by orders 34 and 35. The whole business was run at a substantial operating loss and required an invasion of capital rather than permitting any return on capital invested. It is neither claimed nor apparent that order 33 played any part in producing this result. The claim is that orders 34 and 35, by fixing a co-ordinated price structure without sufficient spread between purchase and selling price, compelled the defendants and other dealers similarly situated to operate at a loss and that such orders are unlawful and confiscatory and deprive defendants and said others of their property without due process of law in violation of the Milk Control Law and of section 6 of article 1 of the Constitution of the State of New York and of the Fourteenth Amendment to the Federal Constitution. That argument, however, is unavailing at this time. It relies upon the proposition that order 35 is an outstanding order affecting their sales to " stores." The fact is that the Board has issued order 57, effective February 1, 1934, removing the order 35 minimum price to be charged by dealers to " stores " in New York city and order 57 has not been annulled. No basis is left for the determination sought. Equity deals only with the situation which it finds at the time of the trial and issues its mandates accordingly. The validity of order 35 or of order 34 in its relation thereto is now academic.

*Third.* The defendants contend further, however, that order 34, fixing minimum prices to be paid to producers is rendered invalid, confiscatory, arbitrary and discriminatory because the Milk Control Law makes such an order conditional upon the Board fixing minimum prices upon resales, and the Board, by order 57, has recently annulled its order 35 so far as it fixed prices upon sales from dealers to stores and restaurants in New York city.

It has been shown without contradiction that the effect of order 57 has been to stimulate still further a cut-throat and destructive competition in the sale of milk by dealers to stores and restaurants in New York city and to lower the prices obtainable by dealers from stores and restaurants in said city and to deprive the defendants of the benefit of the higher minimum prices which had been fixed by order 35 and which the Board still maintains and enforces in the other areas of the State. The only reasons for the action of the Board in issuing its order 57 seem to be that it was having too great difficulty in the enforcement of order 35 in respect to sales to stores and restaurants in New York city, that dealers as a whole

were not giving sufficient assistance in enforcement, and that the Board thought it could use its funds to better advantage in enforcing the rights of producers.

It is urged by the defendants, and their reasoning se ms unassailable, that order 57 violated the Milk Control Law. Section 312 provides, in subdivision " a," that the " Board shall ascertain * * * what prices for milk * * * will best protect the milk industry in the state," and " shall take into consideration all conditions affecting the milk industry including the amount necessary to yield a reasonable return to the producer *and to the milk dealer*." By subdivision " b " of that section, the statute continues to direct what the Board *shall* do in the following language: " (b) The Board * * * shall fix by official order the minimum wholesale and retail prices to be charged for milk handled within the state for fluid consumption, * * * including the following classes: * * * 2. By milk dealers to stores either for consumption on the premises or resale to consumers." Subdivision " c " of the section provides: " It is the intent of the legislature that the public emergency requires that the benefits of any increase of prices received by milk dealers by virtue of the minimum price provisions of this section shall be given to producers. To that end, if the Board * * * shall determine " that a milk dealer " has failed to give fair and reasonable effect to such intent," the dealer's license may be suspended or revoked. This subdivision seems to apply where the Board has fixed no prices to be paid by milk dealers to producers. This is clear from reading section 312 as a whole and from the place in which subdivision " c " is found in that section. The section directs the Board to determine prices which " will best protect the milk industry " and to take into consideration in fixing prices " the amount necessary to yield a reasonable return * * * to the milk dealer " (Subd. " a "). Then follows the mandatory provision requiring it to fix minimum prices to be charged by dealers (Subd. " b "). Then follows subdivision " c." After that, and in subdivision " d," the section provides for the first time for the fixing of prices to be paid by milk dealers to producers and then only that the Board " may " fix minimum prices to producers. Subdivision " e " provides that " after the Board shall have fixed prices to be charged or paid for milk, * * * it shall be unlawful for a milk dealer to sell or buy or offer to sell or buy milk at any price less or more than such price or prices as shall be applicable to the particular transaction."

The Legislature took the industry as it found it and aimed to protect it as a whole by a co-ordinated price structure which would at least preserve the dealers while aiming ultimately to improve

the prices to producers. The latter could not receive benefits without a price structure which the consumer could bear and under which the dealer could continue to operate. Even assuming that " reasonable return " to the dealer did not compel a fair return on the fair value of a dealer's property invested in the business, but only contemplated an effort to that end, it could not have been the intention that dealers should not be compensated even to the extent of reimbursement for reasonably necessary operating costs because of insufficiency of spread between fixed prices at which they must buy and sell in the reasonable continuance of their established business. Perhaps there may be greater economies to be practiced in the industry or a realignment of business by dealers may produce greater combined facilities to operate more profitably under the classified price plan, but that takes time and reorganization expenses. I find nothing in this emergency legislation which contemplates more than taking the industry as it exists and seeking to protect and preserve it as a whole even though the ultimate purpose was to improve the buying power of the producers.

There is no reason to go into the question whether every dealer is entitled to protection. It has not been made clear that these defendants who have been in the business for many years should be eliminated. They have asked not to be compelled to obey an order which will confiscate their property. The situation was bad enough before the annulment of order 35 as to sales to stores and restaurants in New York city. Perhaps the major losses to defendant were due to loss of trade due to price-cutting by competitors for which neither they nor the Board were responsible. The defendants did show, however, that the spread allowed for sale of bottled milk and cream to stores and restaurants was less than the cost of doing that class of business without reference to such price-cutting. The Board has made a bad situation worse by order 57 in which it withdrew the benefits of order 35 from all New York city dealers irrespective of endeavor to observe the orders of the Board. The result has been to demoralize the market in question in the manner already noted and which vitally affected these defendants. The reasons actuating the Board, to which I have adverted, do not seem adequate foundation for a decree in equity to compel these defendants to live up to the strict letter of order 34 in which they have done no more than to offer to buy milk from their producers at less than Board prices. It seems to me that it is inequitable to visit the penalty of an injunction upon these defendants under these circumstances, leaving them stripped of the protection intended by the statute by an unbalanced price structure which compels them to buy at a fixed price and sell in a demoralized and glutted

market largely contributed to by the action of the Board in making its order 57. It was the duty of the Board to protect dealers as well as producers in the manner contemplated by the statute. It was not inequitable to challenge the validity of order 34 if dealers were being deprived of the benefits of order 35 either through lack of enforcement or through annulment and especially if the experience of six months had revealed that compliance with orders had produced only an operating loss to the defendants and others similarly operating in the industry. Perhaps a real source of the loss to the defendants' business as a whole is that they are not equipped with facilities to distribute their surplus by manufacturing into cheese, butter, ice cream, etc., like a few of the largest dealers in the State do and thereby obtain the benefits of the lower prices to be paid by them under the classified price plan. That is a misfortune for the defendants but it all the more emphasizes the equity of protecting them in their more limited market by a proper co-ordinated price structure and enforcing it for their benefit. The injunctive remedy is an extraordinary one and must be exercised with great caution. " An equity court is not bound to decree an injunction where it will produce great public or private mischief, merely for the purpose of protecting a technical or unsubstantial right." (*McCann* v. *Chasm Power Co.*, 211 N. Y. 301, 306; *Lyon* v. *Water Commissioners of Binghamton*, 228 App. Div. 585, 590.)

If any further argument is needed to show that these complaints should be dismissed, it is that order 57 is discriminatory. While dealers in New York city and throughout the State are required under order 34 to pay the same prices to producers of milk, dealers in other parts of the State outside of New York city have the protection of a resale price to stores and restaurants which is denied to the defendants and others similarly situated in New York city without a reasonable basis for such classification. It denies to the defendants and said others the equal protection of the law and renders order 34 arbitrary, unreasonable, discriminatory and void as against the said defendants.

Judgment should be rendered in favor of the defendants and the complaint in each case should be dismissed, without costs. Findings may be prepared in accordance with this opinion.