[L. A. No. 17207. In Bank.—March 30, 1940.]

G. S. RAY et al., Respondents, v. W. B. PARKER, as Director of Agriculture, etc., Appellant.

Earl Warren, Attorney-General, and Walter L. Bowers, Deputy Attorney-General, for Appellant.

Lewis D. Collings and Edward M. Selby for Respondents.

Howard B. Crittenden, Jr., as *Amicus Curiae*, on Behalf of Respondents.

CURTIS, J.—The defendant, as Director of Agriculture of the State of California, prosecutes this appeal from a decree permanently enjoining him from enforcing and administering in Los Angeles County the Milk Stabilization Act (Chap. 10, Div. IV, Agr. Code) and the terms and provisions of a "Stabilization and Marketing Plan" theretofore formulated thereunder and declared effective by him in said county.

The action was commenced by certain producers, distributors, and consumers of milk in the county, eighty-three in number, and was grounded upon the dual theory that the act

and the procedure of the director thereunder ran counter to certain provisions of both the federal and state Constitutions. In many respects, the assaults upon the act itself parallel those advanced and, with one exception, found to be without merit, in the case of *Jersey Maid Milk Products Co.* v. *Brock*, 13 Cal. (2d) 620 [91 Pac. (2d) 577]. However, at the time of the commencement, trial, and determination in the court below of the present action, this court had not yet expressed itself in the Jersey Maid case, *supra*, upon the constitutionality of the act, and consequently the parties hereto and the trial court were without the benefit or guiding influence of the decision in that case. We are satisfied that the determination of the present cause would have been entirely different if the decision in the Jersey Maid case, *supra*, had been then available. In so stating, we are not unmindful that peculiar to this case there is involved what may be generally termed an issue charging a lack of procedural due process in the conduct and activity of the director under the statute, which was not involved in the Jersey Maid case, *supra*, but we feel reasonably certain in stating, after examination of the record herein, and particularly the findings, that the determination of the "procedural issue" against the defendant director was greatly influenced by the conclusion of the trial court that the act itself was unconstitutional and unenforceable, with the consequent result that the stabilization and marketing plan under which the director was proceeding in the county was likewise wholly invalid and ineffective from its inception. In the interest of brevity, we hereby refer to pages 626–635 of our opinion in the Jersey Maid case, *supra*, where the chronology of the statute and most of its more important provisions are set forth in considerable detail. We deem it unnecessary to repeat them here.

As pointed out in the Jersey Maid case, *supra*, 636, discussion as to the constitutionality of any act of the legislature should be premised with the universally recognized principle that all intendments and presumptions are in favor of constitutionality and that all doubts must be resolved in favor of validity. Many of the authorities so holding are collected in the cited case. Preliminarily, too, it should be pointed out that there can no longer be any question that the milk industry bears a close relation to the public welfare and is sufficiently clothed with a public interest to warrant

its regulation under the exercise of the police power, not only in emergencies but at all times. (*Nebbia* v. *New York,* 291 U. S. 502 [54 Sup. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469]; *Highland Farms Dairy* v. *Agnew,* 300 U S. 608, 611 [57 Sup. Ct. 549, 81 L. Ed. 835]; Jersey Maid case, *supra,* 731, 732, and cases there cited.) Moreover, the trial court substantially so found, and in the absence of an appeal by the plaintiffs-respondents the finding is here binding upon them and they are now precluded from challenging the act in this particular.

While the respondents in their complaint challenged the validity of many other sections of the act, the trial court confined its findings and conclusions of invalidity to sections 735c, 736, 736.1, 736.3e, 737.11a, b, c, d, and e. A few of these sections were held to be unreasonable and discriminatory but in the main they were found to be invalid because of their asserted improper delegation of the legislative and judicial functions. Based on such findings of invalidity in the act, and aside from asserted procedural defects to be later and separately considered, the trial court also found and concluded that the director was without jurisdiction to proceed thereunder and that his designation of area, his formulation of a stabilization and marketing plan, and his fixation therein of minimum producers' prices and minimum wholesale and retail prices was abortive and wholly ineffective from the beginning and for all purposes. Before directing our attention to specific assaults upon the act, we have no hesitancy in preliminarily stating that nothing in the briefs of respondents herein or of *amicus curiae* has served to undermine our conclusion announced in the Jersey Maid case, *supra,* that the act is not susceptible to the constitutional onslaught urged against it, particularly with reference to the asserted improper delegation of legislative and judicial functions, with one exception noted and held to be separable in the Jersey Maid case, *supra,* and which will hereinafter be mentioned.

We shall adopt the method employed by the parties in their briefs and specifically consider the arguments directed against the constitutionality of the act by the respondents in their effort to uphold the decree entered by the trial court. Respondents urge that the act is special and discriminatory in character and lacking in uniformity of operation. In so contending, they concede the settled rule to be that a statute

is uniform in its operation if it applies to all persons or objects within a class founded upon a natural, intrinsic or constitutional distinction. The uniform operation of the act here involved was generally considered in the Jersey Maid case, *supra*, 639–641, 645–647. Respondents assert that a lack of uniformity exists in section 737.7 which makes any violation of the unfair practices provisions of a stabilizaton plan subject, among other things, to a civil penalty of $500. They claim that this latter penalty is exacted only from a violator in a marketing area wherein a stabilization plan is in effect and is not imposed upon a violator in an area where no plan exists. We are satisfied that such legislative classification or distinction between violators of the act generally and violators of a marketing plan formulated thereunder is not arbitrary but reasonable, the additional penalty for a violation in the latter case finding its justification at least in part in the great expense and effort entailed in the formulation and carrying out of a stabilization plan. But, aside from this, section 737.7, here challenged, is not among the sections found to be invalid by the trial court, and respondents, not having appealed, are not in a position to again challenge its validity in the face of the trial court's finding thereon adverse to them.

■ Respondents also urge that the act lacks uniformity for the asserted reason that the license fees required to be paid by all distributors under section 737.6 of the act, whether or not they operate in a marketing area where a stabilization plan exists, go into a fund for the enforcement of the act or any plan thereunder. It is contended that by the exaction of such fees distributors in areas wherein no stabilization plan exists are required to support plans in other areas from which they receive no benefit. There are several complete answers to this contention. First, the act does not support it. Under section 735.9 all moneys received by the director go into the "Department of Agriculture Fund" which, under section 26 of the Agricultural Code, are expended not for any particular stabilization plan or plans but for the better enforcement of the entire act, article or law under which it is derived. It has never been held that fees or assessments must be ear-marked and expended in the territory where collected. The act is for the benefit of the entire state and expenditure of funds collected thereunder wherever beneficial to enforce-

ment is appropriate. In the second place, none of the respondents comes within the class of distributors assertedly discriminated against, i. e., distributors in an area where no plan exists. A plan has been formulated for and declared effective in the Los Angeles area and its operation is stayed only by the decree here under review. It is universally recognized that only those in a class discriminated against may raise the constitutional issue. Finally, the license fees provisions of section 737.6 are not among those found to be invalid by the trial court, and again respondents not having appealed may not challenge adverse findings.

 The first and third reasons just above stated, apply with equal force and effect to the contention that sections 737.6b and 736.14, providing respectively for assessments on producers and distributors, also lack in uniformity. For either or both of said reasons the point is without merit.

 Nor do we find any merit in the contention that the licensing requirements imposed on distributors by section 737.5 lack in uniformity because of the exemption therefrom of retail stores under the provisions of section 737.12. A similar contention was held to be without merit in *In re Willing*, 12 Cal. (2d) 591, 595, 596 [86 Pac. (2d) 663], wherein after a detailed statement of facts indicating that a distinction exists between distributors as a class and retail stores as a class, it is concluded that "The separate classification of distributors and retail stores is, therefore, constitutional. It is only where class legislation is arbitrary and unreasonable that it is invalid." Another sufficient answer to the point is that neither of the cited sections was found by the trial court herein to be discriminatory or invalid and respondents therefore may not now claim otherwise.

 The argument is advanced by the respondents that a lack of uniformity in the operation of the act will result as to producers from those provisions thereof which contemplate a division of milk into four classes with a different price for each class. Inasmuch as milk coming within class 4 will bring a lower price than milk in class 1, it is urged that producers will be at the mercy of distributors because the latter may devote all of one producer's milk to class 4 usage and pay him only the price applicable thereto while favoring other producers and employing their milk in the higher classes with a consequent greater financial return to the lat-

ter. This weakness, even if it be accepted as such, is not attributable or peculiar to the act for nowhere therein are producers compelled to deliver milk to any particular distributor or distributors. Even before the enactment of this legislation distributors were free to so use a producer's milk or to offer him a nominal or destructive price. The legislation was not intended to, nor does it, stifle competition in the industry. Those engaged therein are still insured the guarantees of industry and efficiency. In addition, the unfair practice provisions of the statute, applicable throughout the state and required to be included in every stabilization plan (section 736.3a) make it mandatory that the purchase of more than 100 gallons monthly must be by written contract stating, among other things, the quantity to be paid for as class 1 and class 2, and the price to be paid for each of the several classes of milk, a copy of which contract is to be filed with the director. In our opinion, producers and distributors of milk and the consuming public will benefit more under the protective wing of the act than they did under the destructive practices and influences that formerly prevailed in the industry. An alternative answer to the contention presently under consideration is that here again do we fail to discover any findings by the trial court of lack of uniformity or other constitutional invalidity in the provisions of sections 735.3 and 735.4, or any other sections of the act having to do with the definition, classification, or fixing of minimum prices with respect to the four classes of milk.

■ However, respondents met with more than a fair degree of success in the trial court in their assault upon the validity of the act based on its asserted improper delegation of legislative functions. In this respect, the act is said to offend in the matter of the powers conferred upon the director (a) in the designation of marketing areas, (b) in the formation of stabilization and marketing plans, and (c) in prescribing the contents of such plans. Substantially the same arguments were advanced in the Jersey Maid case, *supra*, 641–659. For a full discussion of this subject reference should be had to our decision in the cited case. However, in order to eliminate all doubt that we there held valid as against such challenge the very sections here found by the trial court to be susceptible thereto, we shall specifically, but briefly, touch thereon. As indicated at the commence-

ment of this opinion, the trial court herein found sections 735c and 736, among others, invalid as containing an improper delegation of legislative powers. Inasmuch as the former section constitutes but a part of the declaration as to the necessity for the legislation and the purposes underlying the same and in support thereof merely recognizes and declares the existence in the milk industry of conditions requiring the designation of marketing areas and the adoption of regulations therein, we shall give said section but passing mention for what we said in the Jersey Maid case, *supra,* with respect to section 736, equally disposes of the challenge to section 735c. The discussion respecting this section of the statute in the Jersey Maid case, *supra,* is found on pages 641–659 of our opinion in that case. We find it unnecessary to restate here what we said in that opinion.

Nothing urged in the briefs herein serves to cause us to recede from the foregoing conclusion reached in that case respecting the constitutionality of said section. However, while now recognizing the adequacy of the standards specified in the act for the determination of the boundaries of marketing areas (viz., the existence of reasonably uniform conditions), the respondents contend that section 736 does not require the director to designate a marketing area in every locality where the conditions are reasonably uniform but instead authorizes the director to designate such marketing areas as "he deems necessary or advisable to effectuate the purpose of this chapter." This, it is asserted, improperly leaves the matter of designation of areas to the sole and uncontrolled discretion of the director. Respondents cite *People* v. *Parks,* 58 Cal. 624, in support thereof. We find no merit in the argument. Contrary to the Drainage District Act involved in the cited case, the milk act now before us contains a legislative declaration or preamble fully setting forth the purposes of the act and the evils to be corrected with instructions to the director to designate marketing areas in localities where the conditions are "reasonably uniform" and where such areas are deemed "necessary or advisable to effectuate the purposes of this chapter". Obviously, the legislature could not in advance determine whether these requirements existed in any particular locality or localities and therefore it could properly leave the administrative function of ascertaining the facts to the Director of Agriculture. Under the above-mentioned guides and standards so

prescribed in the act, the director does not possess an uncontrolled discretion in the designation of marketing areas. Support for our conclusion is found in *United States* v. *Rock Royal Co-op.*, 307 U. S. 533 [59 Sup. Ct. 993, 83 L. Ed. 1446]. The following excerpt from the concurring opinion of Justice McKinstry in the case of *People* v. *Parks, supra,* 655, relied on by the respondents, emphasizes the distinction between the statute now before us and the one there involved. It was there said that, "The act does not contain a legislative declaration that the draining of any and all overflowed lands in the State shall constitute a public benefit, or that the draining of any definite tract of such lands will be of benefit to the occupants or owners of adjacent lands—as a sanitary measure or otherwise. If the act had declared that lands specifically described should be drained, I am not prepared to say that the task of ascertaining what lands would be benefited might not be assigned to executive officers, or that the lands reported by such officers would not constitute a legal assessment district." Moreover, the Parks case was decided at an early date and long prior to the full development of administrative boards and the law applicable thereto as we now know them. The case of *In re Peppers,* 189 Cal. 682 [209 Pac. 896], also relied on by respondents, was distinguished by us in the Jersey Maid case, *supra,* 656, 657. Additional discussion of that case is here unnecessary. Other authorities cited in this connection by respondents do not shake our conclusion and need not be specifically mentioned. Each necessarily turned upon the provisions of the particular act involved.

We are of the view that the trial court also erred in finding, pursuant to respondents' contention which is here reiterated, that section 736.1 of the act having to do with the formulation of stabilization plans following designation of marketing areas is likewise unconstitutional. Here, too, it is urged that the director has been clothed with an uncontrolled discretion. It is argued that even after the filing of a petition or the holding of a hearing under the section showing the desires of the producers in a marketing area as to the formulation of a stabilization plan, it still remains in the complete discretion of the director to determine whether such a plan, with all of its incidents, shall be formulated for the area. What has been said under the point next preceding is equally applicable here. True, the section does not make

the formulation of a plan dependent solely on the desires of the producers, but equally the director is not unconfined in his action. When the producers in the area signify their desire in the premises, it then becomes essential to the initiation of a stabilization plan that the director determine whether one is required in said area to accomplish the declared purposes of the act. As indicated under the point last above discussed, the result is not to confide in the director an unbridled discretion but merely an authority to determine under all the circumstances the necessity for a plan measured by the standards and restrictions declared in the act. The Rock Royal case, *supra,* which distinguishes the factual situation present in *Schechter Poultry Corp.* v. *United States,* 295 U. S. 495 [55 Sup. Ct. 837, 79 L. Ed. 1570, 97 A. L. R. 947], cited by respondents, may again be cited in support of our conclusion. Moreover, the contention that section 736.1 improperly confers legislative functions upon the director was fully considered and appropriately rejected in the Jersey Maid case, *supra.* See pages 644, 645 of our opinion therein.

A provision substantially similar to the one in our act was contained in the Virginia Milk Act of 1934 and that act was upheld in its entirety against assertions that it improperly delegated legislative authority. (*Reynolds* v. *Milk Com. of Virginia,* 163 Va. 957 [179 S. E. 507, 509, 514]; see, also, *Highland Farms Dairy* v. *Agnew,* 16 Fed. Supp. 575, 577, 581.)

Respondents urge that certain other provisions of the act having to do with the contents or substance of stabilization plans likewise run afoul of the constitutional inhibition in that they assertedly confer upon the director an unfettered legislative power to classify milk and to prescribe minimum prices for any one or more of the four classes therein contemplated. Respondents do not question the right of the legislature to fix the price of milk but object to the method prescribed therefor in the act under consideration. While they discuss section 736.3a, b, c, d, and e, they challenge only subdivision "b" thereof and urge with respect thereto that if the director rather than fix the prices of the four classes of milk, as authorized by the act, adopts the authorized alternative of designating methods or formulae therefor he is not carrying out the legislative mandate but instead is making a "law" for the purpose of providing a

method by which the minimum prices are determined. There is no merit in the point. Section 735.3b provides for the division of milk into four classes according to usage and sections 735.4b (4) and 736.3b authorize the fixing of minimum producers' prices or the adoption of methods therefor for any one or more of said classes. However, none of the three last mentioned sections was found by the trial court to be susceptible to the constitutional objection now urged or to any other charge of invalidity and respondents not having appealed are not, as we have stated before, in a position to challenge adverse findings.

This is equally applicable to section 736.3d which provides for the fixing of prices for fluid cream. Aside from this, and on the merits, it may be said that the division of fluid milk into different classes in accordance with the use to which it is put and the fixing of prices therefor are not peculiar to our statute. Milk control acts of other states so provide. The Federal Agricultural Marketing Agreement Act of 1937 contains a substantially similar provision (section 8c [5]) for classification of milk according to usage and the fixing by formula of minimum prices for each classification. With respect thereto it was stated in the Rock Royal case, *supra*, 554, which upheld the cited act, that "the minimum price each handler should pay for milk is fixed by a formula which varies with the butter price range for 92-score butter at wholesale in the New York market during the 60 days preceding the 25th day of the preceding month".

In the Jersey Maid case, *supra*, 652–656, there is a rather full discussion with respect to the provisions of the act covering the fixation of minimum prices by the director. We find it unnecessary to add anything to our views therein expressed and respecting the subject therein discussed.

Section 736.3e of the act relating to equalization pools for pasteurized milk was found by the trial court to contain an improper delegation of legislative power and to be uncertain and discriminatory. Such a pool is not required by the act to be included in every stabilization plan but may be included only after the director has determined, upon petition or hearing therefor, that the designated percentage of producers desire its inclusion. However, the stabilization plan here involved for the Los Angeles area makes no provision for such a pool and, upon the authority of our hold-

ing with respect to the pertinent statutory provision in the Jersey Maid case, *supra,* the respondents now concede in their brief that "it is not involved in this litigation . . . [and] we shall not here present argument on that subdivision". So much for the finding of the trial court with respect to section 736.3e.

This leaves for consideration sections 737.11a, b, c, d, and e, all of which the trial court found to run counter to constitutional inhibitions, principally because of the asserted improper delegation of judicial power. Generally, these sections have to do with the issuance, suspension and revocation of licenses to those engaged in the milk industry. At the outset, we may dismiss subdivision "b" of section 737.11 from further consideration for in so far as it purports to give the director power to fix the amount of damages to which a complainant is entitled for the failure of a distributor to pay for fluid milk or cream, it was held in the Jersey Maid case, *supra,* 651, to be an unconstitutional delegation of judicial power. However, we also there held that said subdivision was clearly separable and had no bearing or effect upon the constitutionality of the remainder of the act. The same disposition of the point may here be made for the director at no time purported to act thereunder in the Los Angeles area, and the invalidity of the subdivision can have no controlling effect upon the determination of the present cause. As to the other subdivisions of section 737.11 we had considerable to say in the Jersey Maid case, *supra,* wherein we found no constitutional objection thereto. We there declared, pages 650–652:

"These two sections, 737.5 and 737.11, should be read together, and when so read, it will be found that they afford adequate standards not only to guide the director in refusing an application for a license but also in revoking or suspending licenses already issued. Section 737.11 reads in part as follows: '(a) The director may refuse to grant any license herein provided and may, after due hearing upon a verified complaint signed and filed with the director by any interested person, revoke or suspend any such license as the case may require, when he is satisfied that any *applicant* or licensee has violated any provision of this chapter, or any provision of any stabilization and marketing plan formulated under the provisions of this chapter.' It will be noted that this section refers to an *applicant* for a license as

well as to a *licensee*. As we construe this section, the applicant may not be granted a license if the director finds, after a hearing, that he has violated any of the provisions of the chapter or any plan promulgated thereunder. He may also revoke or suspend a license for the same reason.

"It is contended by *amici curiae* that that portion of section 737.11 (a) which provides for a hearing after complaint filed only applies to proceedings for the revocation or suspension of a license and does not apply to the granting of a license. We concede that the section is not as clear as it might be, but the inclusion of the word 'applicant' in the section clearly implies that the proceeding therein provided for applies to a person applying for a license as well as a licensee whose license is sought to be revoked or suspended. Subsection (b) of this same section confirms our conclusion that this section applies both to an applicant for a license, as well as to a licensee, as it is therein stated that 'such decision [the decision rendered after the hearing provided for in subsection (a) of said section] may include an order *refusing,* revoking or suspending *the license applied for* or held by respondent'.

"As we construe these sections, they provide that a license may not be granted by a director after a complaint filed, if after a hearing held upon said complaint, the director finds that the applicant has violated either the terms of the act or the provisions of an established marketing plan. It cannot be said, therefore, that the granting or refusing of a license is left to the arbitrary whim of the director, as a license to any applicant, if complaint is made against its issuance, can only be granted after the hearing provided in section 737.11 (a) of said code, and a finding made in favor of the applicant."

The argument of respondent that the "review" of the director's orders provided for in section 735.6 of the act contemplates a review by means of *certiorari,* thereby establishing the functions of the director to be judicial in character, is lacking in merit. In *Agricultural Prorate Com.* v. *Superior Court,* 31 Cal. App. (2d) 518, 524 [88 Pac. (2d) 253], it was said with respect to a somewhat similar provision in the Prorate Act that "the term 'may be reviewed' is not to be confused with the term 'writ of review'. It is quite clear it was intended by the right of review that an interested party should have a right to put in issue before

a superior court a question arising as a result of the promulgation of any order the commission might make.'' Recently this court has had much to say with respect to the ''review'' of orders of statewide administrative boards and officers. (*Standard Oil Co.* v. *Board of Equalization,* 6 Cal. (2d) 557 [59 Pac. (2d) 119] ; *Whitten* v. *California State Board of Optometry,* 8 Cal. (2d) 444 [65 Pac. (2d) 1296, 115 A. L. R. 1] ; *Drummey* v. *State Board of Funeral Directors,* 13 Cal. (2d) 75 [87 Pac. (2d) 848] ; *McDonough* v. *Goodcell,* 13 Cal. (2d) 741 [91 Pac. (2d) 1035, 123 A. L. R. 1205].)

In concluding our discussion and disposition of the challenges addressed to the constitutionality of the milk act in the Jersey Maid case, *supra,* 658, 659, we declared that:

''The practice of delegating to administrative officers or boards powers which were originally performed directly by the legislature is of long standing and has met the approval of the highest courts in this state as well as in other jurisdictions. 'The policy of the law favors the placing of detailed responsibility in administrative officers. The courts uphold statutes vesting such powers in such officers if it is possible fairly to do so, at least where the powers are merely ministerial. In order to justify the courts in declaring a statute imposing particular duties or conferring authority upon administrative officers to be inoperative as a delegation of legislative power, it must clearly appear beyond a reasonable doubt that the duty or authority so imposed or conferred is one appertaining exclusively to the legislative department and that the delegation of it is not warranted under the provisions of the Constitution.'' (11 Am. Jur., p. 955.)

''In the recent decision of this court entitled *East Bay Municipal District* v. *Department of Public Works,* 1 Cal. (2d) 476 [35 Pac. (2d) 1027], we find the following statement of the law as announced in *Gaylord* v. *City of Pasadena,* 175 Cal. 433, 436 [166 Pac. 348], cited with approval, ' ''It has become increasingly imperative that many *quasi*-legislative and *quasi*-judicial functions, which in smaller communities and under more primitive conditions were performed directly by the legislative or judicial branches of the government, are entrusted to departments, boards, commissions, and agents. No sound objection can longer be successfully advanced to this growing method of transacting public business. These things must be done in this way or

they cannot be done at all, and their doing, in a very real sense, makes for the safety of the republic, and is thus sanctioned by the highest law. For as the Supreme Court of the United States declares: 'Indeed, it is not too much to say that a denial to Congress of the right, under the Constitution, to delegate the power to determine some fact or the state of things upon which the enforcement of its enactment depends, would be ''to stop the wheels of government'' and bring about confusion, if not paralysis in the conduct of the public business.' '' '

''For additional authorities supporting this statement, see cases cited in the opinion in the case of *East Bay Municipal Utility District* v. *Board of Public Works, supra.*

''This statement of the law also answers the contention of the respondent and *amici curiae* that in a number of instances judicial power is conferred upon the director of agriculture in that he is empowered to hold hearings at which evidence is produced and findings of fact are made by him.

''In the case of *Globe Cotton Oil Mills* v. *Zellerbach,* 200 Cal. 276, 277 [252 Pac. 1038], it was held the granting of power to the Fish and Game Commission to hold hearings and determine the facts incidental to the regulation of the fish and game and to the granting of permits to take and use fish, was valid as an administrative or regulatory power, and in nowise transgressed upon the exclusive functions of the judicial department. This ruling is supported by *People* v. *Sacramento Drainage Dist.,* 155 Cal. 373, 387, 388 [103 Pac. 207], and *Tarpey* v. *McClure,* 190 Cal. 593, 606 [213 Pac. 983].

''We, therefore, conclude that, with the exception of the provision in section 737.11 (b) of said chapter 10, division IV, which purports to give to the director the power to fix the amount of damages to which a complainant is entitled for the failure of a distributor to pay for fluid milk or fluid cream purchased of a producer, none of the provisions of said chapter which has been called to our attention by either the respondent or *amici curiae* is invalid by reason of the alleged delegation of either legislative or judicial power to the director of agriculture.

''We have already considered the effect of the invalidity of this provision of section 737.11 (b) upon the other provisions of said chapter, and have shown that it does not in any way render invalid the remaining valid portions of the act.

"Legislation which has for its purpose the regulation and stabilization of the milk industry, even to the extent of fixing prices for which milk may be bought and sold, is not any new development in our social legislation. While it is of recent enactment in this state, it has been in force in other states for many years last past. It has been, with few exceptions, upheld by the courts of the various sections of this country, including the United States Supreme Court and the highest appellate courts of the following states: Illinois, Iowa, New York, Virginia, Alabama, Arizona, Arkansas, Florida, Georgia, Indiana, Pennsylvania, Wisconsin, Massachusetts, and New Jersey."

As stated at the commencement of this opinion, we have found nothing in the briefs herein which requires or even suggests that we recede from the views expressed in the Jersey Maid case, *supra*, upon the constitutionality of the milk act contained in Chapter 10 of Division IV of the Agricultural Code. This alone requires a reversal of the decree permanently enjoining the director from acting thereunder. We now pass to a consideration of the contentions and arguments advanced against the methods and procedure employed by the director in his designation of the Los Angeles marketing area, his formulation and adoption of a stabilization plan therefor, and his fixation of minimum prices thereunder, all of which it is asserted resulted in a deprivation of procedural due process.

At the outset, it may generally be stated that the respondents are dissatisfied with and have challenged every step taken by the director in the Los Angeles area from the first order designating it as a marketing area down to and including the last order establishing minimum wholesale and retail prices therein. The trial court found that this broadside attack had merit and concluded that General Regulation No. 3 and General Orders Nos. 9, 14, 29, 39 and 40 issued by the director and which will later be more definitely described and identified, were void for several designated reasons, among them being, asserted invalidity of the provisions of the act authorizing the same (disposed of above), asserted improprieties in the hearings conducted by the director preliminary to the making of such orders, and asserted insufficiency of the evidence adduced at such hearings to support said orders. And this, despite the fact that all of such orders except the last

one were made more than thirty days prior to the commencement of this action, that being the period of limitation prescribed in section 735.6, above referred to, within which orders of the director may be "reviewed".

In view of our conclusion hereinafter announced upon the merits of the procedure and methods employed by the director, we give but passing notice to the time limitation placed upon a review of the director's orders. While respondents' direct and principal attack is aimed at "General Order No. 40," fixing minimum wholesale and retail prices, it is obvious that they have collaterally challenged everything that preceded said order in the matter of the designation of the Los Angeles marketing area and the formulation, adoption and amendments of its stabilization plan in an effort to thereby break down and destroy the foundation upon which the price fixing order must rest. In order to properly gauge and understand the challenged procedure employed by the director in the Los Angeles area, it is necessary that we again refer to the chronology of the milk act. As already stated, this act (Chap. 10, Div. IV) was first added to the Agricultural Code in 1935. It was then generally provided that a proceeding might be initiated by 65 per cent or more of the commercial producers of milk proposing the establishment of a designated marketing area. Upon receipt of such application, the Director of Agriculture was required to call a meeting of the producers supplying such area at which meeting the producers could nominate candidates from whom the director selected and appointed a local control board of not less than seven nor more than thirteen members. The local control board was authorized to formulate a plan which, among other things, might prescribe the minimum prices to be paid by distributors to producers. Such plan became effective upon approval of the director. Pursuant to this act and in the year 1936, a local control board was appointed for the Los Angeles area and a stabilization plan was made effective therein on July 23, 1936, which fixed the price to be paid by distributors to producers at 59 cents per pound of milk fat contained in the milk. By proper amendment of the plan, this price was raised to 69 cents on August 22, 1936. In January, 1937, the legislature substantially amended and revised chapter 10 as to the manner of designating marketing areas and formulating stabilization plans thereunder. How-

ever, in so doing, it provided that "all stabilization and marketing plans in effect on the effective date of this act, and all rights and liabilities accruing under such plans shall not be affected by this act, but such plans may be superseded at any time by a plan formulated as prescribed in said Chapter 10 of Division IV of the Agricultural Code as amended by this act". (Sec. 22, chap. 3, Stats. 1937.) As a result of this first 1937 amendment, section 736 of the milk act was made to read in part that "as soon as possible after the effective date of this chapter the director shall designate marketing areas. . . . " Apparently proceeding under the assumption that this required a new designation of marketing areas, the director on February 3, 1937, issued an order again designating or redesignating Los Angeles County as a marketing area. This order is identified as "General Regulation No. 3" and is assailed by the respondents on the ground that it was made without notice or hearing and thereby resulted in a deprivation of due process of law. Aside from the fact that such redesignation of area was probably an unnecessary act, and aside from the further fact that a mere designation of marketing area can hardly be said to interfere with or have any effect upon life, liberty or property so as to come within the meaning and salutary restrictions of the due process clause, we need give but little consideration to "General Regulation No. 3" for the reason that the director thereafter suffered a change of mind as to the proper procedure to be followed and thereupon gave notice on April 6, 1937, of a public hearing to be held on April 17, 1937, for the designation of an area. This notice which defined the boundaries of the proposed area as commensurate with those of Los Angeles County, was included with a notice given by the director of a public hearing to be held on the same date as to a proposed stabilization plan he had formulated for said area, which plan was formulated upon receipt of what he determined to be a sufficient and adequate petition therefor under section 736.1, as amended. We shall discuss this petition further along in the opinion. At the time designated, April 17, 1937, the director called the meeting to order and asked if any person present had any objection to, or any evidence to offer regarding the area as described in the notice. No evidence was offered by anyone present relative to designation of the area, whereupon the hearing proceeded to a consideration of the second pur-

pose for which it had been called, viz., formulation of a stabilization plan, to which we shall also refer later. Shortly after this hearing and on April 28, 1937, the director issued "General Order No. 9", here challenged by the respondents, wherein he again designated Los Angeles County as a marketing area and rescinded his prior "General Regulation No. 3" which had redesignated such area without previous hearing. ■■■ Respondents contend that if the act permits designation of an area without prior hearing it improperly delegates a legislative function to the director. In the Jersey Maid case, *supra,* and again herein, we have held that sufficient standards have been prescribed for the guidance of the director in this and other respects and that there has not been a delegation of legislative power. In the alternative, respondents urge that if the act contemplates a hearing, the one conducted by the director failed to meet the requirements of due process.

■■■ The authorities tend to indicate that a hearing is not essential to the establishment of territorial boundaries of districts of the character here involved, in the absence of specific requirement therefor in the statute itself. In the case of *Potter* v. *Santa Barbara,* 160 Cal. 349, 355 [116 Pac. 1101], it is declared that, "The formation of this [permanent road division] and similar districts is a function pertaining purely to the legislative branch of the government. The Legislature can create them, or cause them to be created [under prescribed standards], without giving any person a voice or hearing upon the matter." The authority conferred upon the department of agriculture by sections 221e and 234 of the Agricultural Code to establish and delimit by proclamation, and without hearing, bovine tuberculosis control areas never has been questioned. An Iowa statute, similarly providing, was upheld against an attack that it made no provision for hearing. (*Fevold* v. *Board of Supervisors,* 202 Iowa, 1019 [210 N. W. 139, 141]; *Peverill* v. *Board of Supervisors,* 208 Iowa, 94 [222 N. W. 535, 541].) The appellant director asserts that milk statutes of other states have been generally upheld in the absence of provisions for hearings in connection with the designation of areas, citing, *Franklin* v. *State,* 232 Ala. 637 [169 So. 295]; *Miami* v. *Milk Control Bd.,* 124 Fla. 797 [169 So. 541]; *Bohannan* v. *Duncan,* 185 Ga. 840 [196 S. E. 897]; *Albert* v. *Milk Control Bd.,* 210 Ind. 283 [200 N. E. 688];

*State Board of Milk Control* v. *Newark Milk Co.,* 118 N. J.
Eq. 504 [179 Atl. 116]; *Rohrer* v. *Milk Control Bd.,* 322 Pa.
257 [186 Atl. 336]; *Reynolds* v. *Milk Com.,* 163 Va. 957 [179
S. E. 507]; *State* v. *Lincoln Dairy,* 221 Wis. 1 [265 N. W.
197, 851]; *Nebbia* v. *New York, supra; Highland Farms
Dairy* v. *Agnew,* 300 U. S. 608 [57 Sup. Ct. 549, 81 L. Ed. 835]
(Dist. Ct. Opinion, 16 Fed. Supp. 575). As stated herein-
above, a hearing upon the designation of area would not ap-
pear indispensable to ''due process'' for no one thereby suf-
fers any injury to or loss of life, liberty, or property within
the meaning of that clause of the Constitution. As stated by
us in the Jersey Maid case, *supra,* 740, ''As all producers and
distributors have the right to participate in the final meeting
at which the plan is adopted, none can complain that he is de-
prived of any right without an opportunity to be heard.''
■ However, assuming for the present purposes that the
act requires a hearing preliminary to the designation of area
(and this is by no means certain because of the apparent in-
consistency between the general provisions of section 735c and
the specific provisions of section 736), we are of the view that
the procedure adopted by the director satisfied all essential re-
quirements for all persons known to be interested were in-
formed in advance by the notice of the purpose of the hearing
and the territory proposed to be included in the area. Re-
quests by the director for evidence and for suggestions with
respect thereto went unheeded at the hearing. Respondents
should not be permitted to ignore the opportunity so afforded
them to be heard upon the designation of the area and at this
late date be allowed to assert that a denial of due process
occurred therein. This is particularly so when, as already in-
dicated, the identical area had been designated almost a year
previous under the earlier act and ''General Order No. 9'',
here challenged constituted but a redesignation thereof. To
require the introduction of evidence by the director at such
hearing in order to assist him in determining a matter he had
already determined months previously would be to sacrifice
substance to form. The authorities suggest another complete
answer to respondents' contention with respect to the nature
of the hearing held prior to the designation of area by ''Gen-
eral Order No. 9'', but inasmuch as the trial court found, and
respondents urge generally, that not only that order but all
subsequent orders of the director are void because of the sub-

stantially similar and assertedly improper manner in which he conducted the hearings thereon, we proceed to an outline of such other proceedings and orders, returning later to a discussion of the objection addressed to all of them.

After designation of the area, the first essential in the formulation of a stabilization and marketing plan, under section 736.1 as amended in 1937, is either a hearing or the filing of a petition to determine whether the requisite number (65%) of qualified producers desire the same. In the Los Angeles area no hearing was held by the director prior to his formulation of the proposed stabilization plan submitted by him at the noticed hearing of April 17, 1937, above mentioned, but instead he proceeded upon a petition, briefly mentioned above, which had assumed the form of individual postcards which, shortly after the first 1937 amendment of the milk act, had been mailed out to producers on or about February 13, 1937, by the local Milk Control Board, which board, as above stated, was in existence under the old law and prior to the 1937 revision thereof. Six hundred and twenty-eight of these cards, duly signed, were filed with the director on or about March 17, 1937, and it was upon the basis of this postcard petition that the director prepared and formulated a proposed plan for the Los Angeles area which proposed plan he attached to his above-mentioned notice of April 6, 1937, wherein he designated April 17, 1937, for a public hearing not only as to the redesignation of area, already discussed, but for the purpose of hearing evidence upon, or suggestions and objections with respect to his proposed plan for the area.

We find no support for the trial court's findings with respect to, and no merit in the respondents' arguments in connection with, the asserted insufficiency of this postcard petition. The finding and contention addressed to the unconstitutionality of section 736.1, under which the petition was filed, has been shown to be without merit by our decision in the Jersey Maid case, *supra,* and our holding hereinabove.

The fact that section 735.3 was amended by the legislature effective April 21, 1937, after the director had noticed and held a public hearing on the proposed plan but before he had made any order with respect thereto, could not, and did not, contrary to the trial court's finding and the respondents' contention, invalidate the petition theretofore filed under

section 736.1. The amendment of section 735.3 merely amended the definition of milk so as to divide it, for the first time, into four classes. While it is true, the original proposed plan prepared and submitted by the director covered milk as a whole, the amendment dividing milk into four classes not yet having been enacted, it is equally true that such amendment became effective prior to the making of any order by the director following the public hearing on his original proposed plan and in view of such amendment he made no order with respect to the original proposed plan but instead prepared a new proposed plan conforming to the statutory amendment dividing milk into four classes. By notice given on April 28, 1937, a public hearing was called on the new proposed plan for May 10, 1937. As to such later hearing and the order resulting therefrom we shall have more to say later. We are now confining our discussion to the sufficiency of the petition for a plan and are of the opinion that the trial court and the respondents are in error in concluding that the petition for a plan filed and partially acted upon prior to the statutory amendment which divided milk into four classes could not properly be used as the basis for proposing a plan after such statutory amendment. Neither reason nor logic supports such a conclusion. It completely loses sight of the purpose of section 736.1 which is to determine, by hearing or petition, whether 65 per cent of the producers desire *any* stabilization plan and not to ascertain whether such producers desire a *particular* plan. Contrary to accepted practice, any other conclusion would give to the amendment of section 735.3 a retroactive effect in the absence of legislative expression thereon.

 Nor do we think that the postcard petition was defective or misleading because when mailed out by the local Milk Control Board it was accompanied by a letter which stated that such board was petitioning the director to amend the existing plan, created as stated above under the old act and prior to the 1937 revision of the law, so as to bring about a possible change in the price of class 1 milk from 69 cents to 79 cents. The postcard itself made no reference to any price change but merely requested and petitioned the director to formulate a plan under the 1937 amendment of the act. However, when the director received knowledge of the letter that had accompanied the postcard petition, he immediately,

in order to obviate any uncertainty that might arise from the mention of a price therein, communicated with the local board and expressed a fear that mention of a price might be misconstrued and cause some producers to be misled into signing the postcard petition upon the assumption that a 79 cent price would be fixed in the plan to be proposed by him pursuant to the petition. As a result of this apprehension, the local board on March 4, 1937, before any hearing on the original proposed plan or any subsequent revisions thereof, mailed out to all producers who theretofore had been sent the postcard petition, a letter setting forth the entire situation and stating that if any had been misled by mention of a price in the earlier letter they were free to request a return of their signed cards. There is no evidence herein that any requests were made for a return or withdrawal of cards. The minutes of the local board recite that not a single withdrawal of any petition was requested. In fact, 143 signed cards were received by the local board after the second letter had been sent out correcting any misapprehension that might exist. There is no evidence that any of the signers, or any of the respondents herein, some of whom had signed these cards, were misled in any particular. In this connection, see Rock Royal case, *supra*, 558. Ultimately, as already stated, 628 signed cards were received by the local board from producers requesting and petitioning the director to formulate a plan for the area, which cards were thereupon forwarded to the director causing him to formulate the original proposed ''whole-milk'' plan upon which there was a public hearing, as already stated, on April 17, 1937, followed by a further hearing on May 10, 1937, with respect to revisions therein necessitated by the subsequent amendment dividing milk into four classes. In view of what has been said we are satisfied that there is no substantial support for the trial court's findings or the respondents' contention that the postcard petition was misleading and caused the signers thereof to assume that the plan to be thereafter proposed by the director would be based on a 79 per cent producers' price. Nor is there any support for the trial court's finding, or respondents' contention, that no evidence was offered or finding made by the director at the original hearing on the proposed plan that the postcard petition for a plan complied with section 736.1. As already indicated, the cited section authorizes the initiation

of proceedings for a plan either by hearing or petition. Here the petition method was employed and the section expressly declares that in such event it is not "necessary that such hearing be held". Naturally, under the petition method the director would, and the evidence shows that he did, check the petition to ascertain to his own satisfaction that it represented the requisite production before proceeding thereunder. We need not here go into a detailed discussion of the evidence on the point for we perceive nothing of substance that undermines the director's conclusion with respect thereto. We cannot say that the director's action in this respect was arbitrary or capricious or wholly unsupported by the evidence. (*Silberchein* v. *United States*, 266 U. S. 221 [45 Sup. Ct. 69, 69 L. Ed. 256]; *Union Transp. Co.* v. *Bassett*, 118 Cal. 604, 610 [50 Pac. 754]; *Maxwell* v. *Civil Service Com.*, 169 Cal. 336, 339 [146 Pac. 869].) In addition, there is always a presumption that official duty has been properly performed. Moreover, it does not appear, and it was not found, that the petition was defective because not in fact signed by the requisite percentage of producers.

Following his receipt and check of the sufficiency of the postcard petition signed by 628 producers requesting formulation of a plan for the area, the director, as stated above, prepared and, after notice thereof, submitted a proposed plan at the public hearing of April 17, 1937. But, as already mentioned, because of the subsequent amendment of the act dividing milk into four classes the plan so prepared and proposed was out of harmony with the amended act and consequently the director made no order following the original hearing but instead formulated a new plan based on the division of milk into four classes, and issued notice on April 28, 1937, of a public hearing to be held May 10, 1937, on the "revised stabilization and marketing plan". A copy of the proposed revised plan was attached to the notice of hearing. Following this hearing and on May 15, 1937, the director issued "General Order No. 14" by which the plan in effect in Los Angeles County since 1936 under the old act and before its revision by the legislature in 1937, was terminated and the new plan upon which the public hearing had been had on May 10, 1937, was declared to be effective in the area on and after June 1, 1937. The 69 cent price for class 1 fluid milk

existent and prevailing under the old terminated plan was carried over into the new plan.

In the meantime, the legislature had again amended the milk act and in order to cause the plan then in effect in the Los Angeles area to comply therewith, the director on September 17, 1937, gave notice of a public hearing to be held September 28, 1937, for the purpose of considering a proposed amended or revised plan, a copy of which was again attached to the notice. Among other things, the proposed revised plan was to cause the unfair practices provisions of the plan to comport with recent legislative changes. Said revised plan also provided for a 72 cent producers' price for class 1 milk, an increase of 3 cents over the old price. Following such public hearing, the director issued ''General Order No. 29'' on October 4, 1937, by which he declared the revised stabilization plan effective in the area on October 23, 1937.

Thereafter, and on December 29, 1937, the director gave notice of a public hearing to be held January 15, 1938, for the purpose of considering further revision of the plan, a copy of the proposed amendment again being attached to the notice. Following such public hearing, the plan was by ''General Order No. 39'', dated January 18, 1938, again amended or revised, effective February 1, 1938, so as to return the producers' price of class 1 milk to its former level of 69 cents.

In the *interim,* the legislature had added article 2a to the milk act, mentioned at the commencement of this opinion, wherein provision was made for the fixation of minimum wholesale and retail prices. Again in order to keep the plan in effect in the Los Angeles area abreast of the repeated legislative changes, the director on December 24, 1937, sent out notice of a public hearing to be held on January 14, 1938, with respect to a proposed order, copy of which again was attached to the notice, for the fixation of minimum wholesale and retail prices as then authorized by amendment of the act. Following such hearing and on January 18, 1938, the director issued ''General Order No. 40'', declaring the order for the establishment of minimum wholesale and retail prices in effect on February 1, 1938.

Thus, we have before us an outline of the proceedings taken by the director with respect to the Los Angeles area and while, as already stated, respondents' principal attack thereon is

addressed to the last order, No. 40, fixing or prescribing minimum wholesale and retail prices, their challenge of all prior proceedings and orders for the purpose of destroying the structure upon which the last or price fixing order must rest, also met with uniform success in the trial court. Much of what we have already said herein disposes of many of the unsupported findings of the court below, and the corresponding contentions of respondents, with respect to the invalidity of the several described orders because of an asserted lack of jurisdiction in the director to proceed. Such findings, as we have shown, were based on the equally unsupported and erroneous findings and conclusions, already considered, that the act itself and the petition for formulation of a plan thereunder were ineffective and void. We shall now direct our discussion to those findings and contentions relative to the manner in which the director conducted the respective hearings which preceded the making of the several orders above designated. As already stated, a copy of each proposed order or contemplated revision of the plan was attached to each of the notices sent out by the director with respect to the public hearing to be thereafter held thereon. Those interested therein were thereby adequately informed in advance by the director as to the exact nature and purpose of each hearing and of the character of the order thereafter to be made. Upon the calling of the several hearings to order, the director almost invariably would invite those present to offer any suggestions, objections or evidence pertinent to the subject upon which the hearing had been noticed. In some instances, those present remained silent, offering neither suggestion nor objection. Upon other occasions, evidence was offered by interested persons. Certain of the director's assistants and experts who had gathered information and data for his proposed orders were present at the hearings, and were declared by him to be available to the examination or cross-examination of participants at the hearings, an offer which was availed of on several occasions. Without cluttering the record therewith, it was also generally stated by the director at the hearings that the data and information theretofore collected by him after extensive investigation and research and upon which necessarily his orders in part at least had to be predicated were open and available to the scrutiny of persons present. Much technical and statistical data gathered by his assistants, who are rec-

ognized experts in the milk field, concededly is reflected in the director's formulation and several subsequent revisions of the Los Angeles stabilization plan, though not directly placed in evidence by him at the several hearings. As we shall presently show the authorities attest to the propriety of this action at hearings of the character here involved. The fact that section 736.1 requires him to formulate a proposed plan prior to hearing thereon contemplates his previous acquisition of basic data and information. To attempt to outline the exact nature and scope of each of the several hearings would unduly prolong this opinion. Suffice it to say, that the record herein discloses that at each of the several hearings conducted by him the director evinced a willingness to hear all who cared to be heard and a desire to afford every opportunity therefor. Consequently, we are of the opinion that ample notice and an opportunity to be heard was accorded by the director and that the hearings conducted by him satisfied the provisions of the statute and all other appropriate legal requirements. The authorities definitely indicate that hearings of the type conducted by the director under the milk act differ materially from and are not circumscribed by the restrictions applicable to judicial or *quasi*-judicial adversary proceedings. In this connection, it may be said that the subject received some attention from the United States Supreme Court in *Norwegian Nitrogen Products Co.* v. *United States*, 288 U. S. 294, 303, 307, 308 [53 Sup. Ct. 350, 77 L. Ed. 796], having to do with a statute which created a tariff commission designed to make investigations, ascertain facts and report to the President for the purpose of enabling him to establish and change tariff rates. Among other things, it was there said that:

"The decision of this case hinges upon our answer to the question whether the petitioner has been 'heard' in accordance with the statute. Does the requirement of a hearing mean that every producer or importer affected by a tariff may explore at will the data collected by the Commission as to the capital, the wages, the cost of material and manufacture, in the business of any other person similarly affected, and may cross-examine investigators and competitors upon the data thus laid bare? If something less than this is exacted, is there still a minimum of disclosure without which the purpose of the hearing will be thwarted altogether, and was this mini-

mum attained by what was done by the Commission here? . . .

" . . . The statute does not say that the parties affected by the duty may be present during the preliminary investigation by the agents of the Commission. They are to be present at a hearing, which may be public or private as the Commission shall determine. The statute does not say that they are to have an opportunity to produce evidence and to be heard to whatever extent they may desire. It says that they are to have a reasonable opportunity, and this subject to the power of the Commission to adopt such reasonable procedure, rules and regulations as it may deem necessary. Nothing in the statute suggests a belief of the lawmakers that every producer or importer is to be viewed, like a party to a lawsuit, as the adversary of every other, with the privilege of examination and cross-examination extended through the series. 'There must be a limit to individual argument in such matters if government is to go on.' "

In the so-called *"Assigned Car Cases"*, 274 U. S. 564 [47 Sup. Ct. 727, 71 L. Ed. 1204] there was involved an order to the interstate commerce commission by which railroad cars available for coal mines were ratably apportioned among the mines. Those seeking to enjoin enforcement of the order consisted of certain railroads, mine operators, coal distributors, and coal consumers. It was there held, among other things, that, "There was ample evidence to support the Commission's findings. It is not for courts to weigh the evidence introduced before the Commission . . . or to inquire into the soundness of the reasoning by which its conclusions are reached. . . . These are matters left by Congress to the administrative 'tribunal appointed by law and informed by experience'. . . . The argument [as to the insufficiency of the evidence to support the Commission's findings] overlooks the difference in the character between a *general rule* prescribed under paragraph (12) and a practice for particular carriers ordered or prohibited under sections 1, 3 and 15 of the Interstate Commerce Act. In the cases cited, the Commission was determining the relative rights of the several carriers in a joint rate. It was making a partition; and it performed a function *quasi*-judicial in its nature. In the case at bar, the function exercised by the Commission is wholly legislative. Its authority to legislate is limited to establishing a reasonable rule. But in establishing a rule of general ap-

plication, it is not a condition of its validity that there be adduced evidence of its appropriateness in respect to every railroad to which it will be applicable. In this connection, the Commission, like other legislators, may reason from the particular to the general.''

The case of *Highland Farms Dairy* v. *Agnew,* 16 Fed. Supp. 575, 586, wherein hearings held under the Virginia Milk Control Act were under discussion and scrutiny, declares:

''The plaintiffs also complain that the action of the Milk Board in establishing the market area and fixing the minimum prices for production and distribution of milk was not had in accordance with the provisions of the statute, and was taken in violation of due process of law. The point relates to the nature of the public hearing which the Commission conducted. Section 3 (i) provides that the Commission shall not exercise its power in a market until a public hearing has been held for such market and the Commission determines that it will be to the public interest to exercise its powers therein; and section 3 (j) provides that the Commission, after public hearing and investigation, may fix the prices to be paid producers by distributors and to be charged in the wholesale and retail distribution of milk, taking into consideration in determining the reasonableness of the prices, the cost of production and distribution, and the welfare of the general public.

''A public meeting was held in Richmond, Va., on February 20, 1936, at which were present a score of dairymen and milk producers, and some discussion as to the establishment of the market area and the prices of milk took place. It is stipulated that thereafter the Commission established the area and the rules and regulations not only upon the basis of the information obtained by it at this public hearing, but also upon the basis of information subsequently furnished it by interested persons during the month of March, the Commission having announced at the hearing that it would receive additional communications. The Commission also took into consideration certain treatises which the Commission had in its files or received subsequent to the hearing bearing upon the general subject of the marketing of milk. It is contended that not only was the evidence presented at the hearing entirely inadequate to enable the Commission to carry out the duties imposed upon it by the act, but that the Commission

violated the rules of proper procedure when it took into consideration material not offered at the hearing.

"The plaintiffs particularly rely on the decision in *Morgan* v. *United States,* 298 U. S. 468, 56 S. Ct. 906, 80 L. Ed. 1288, which dealt with the duty imposed upon the Secretary of Agriculture to grant a full hearing and receive evidence before fixing rates for stockyard services under the Packers' and Stock Yards' Act of 1921 (7 U. S. C. A. sec. 181 et seq.). It was held that while the order of the Secretary was legislative, the proceeding had special attributes, and that the Secretary was required to make his determination in accordance with the procedural requirements contemplated by the statute, including a full hearing and the reception of evidence adequate to support the necessary findings of fact. Attention was called to the provision of the Packers' and Stock Yards' Act which makes applicable to the jurisdiction, powers, and duties of the Secretary, all laws relating to the suspension or restraint of the enforcement of orders of the Interstate Commerce Commission. The cases cited by the Supreme Court show that it is well established that a proceeding of this character before the Interstate Commerce Commission has a *quasi*-judicial character and that the usual incidents of due process applicable to an adversary proceeding must be followed.

"But it is our view, expressed in absence of a controlling interpretation by the state court, that these cases have no application to the sort of hearing contemplated by the Virginia Milk Control Act. The proceeding before the Milk Commission was not *quasi*-judicial, but legislative. It is true that the act made provision for a public hearing without which the Commission was not authorized either to exercise its powers in any market area or to fix prices; but this hearing was to be of the same nature as that held by a legislative committee in considering proposed legislation. The act contains no directions as to the kind of notice to be given, and evidently merely contemplated notice by advertisement to the general public. No other notice was feasible, considering the large number of persons engaged in production and distribution of milk. The Commission was undoubtedly justified in the exercise of its legislative function in taking into consideration not only the facts presented at the public hearing, but those which came to it subsequently from interested parties or were disclosed by its own investigation into the

facts and the literature bearing·upon the subject. See *State Board of Milk Control* v. *Newark Milk Co.,* 118 N. J. Eq. 504, 179 A. 116, 125, 126; *Norwegian Nitrogen Products Co.* v. *United States,* 288 U. S. 294, 296, 308, 53 S. Ct. 350, 355, 77 L. Ed. 796.'' (The United States Supreme Court affirmed this decree in 300 U. S. 608 [57 Sup. Ct. 549, 81 L. Ed. 835].)

In *State Board of Milk Control* v. *Newark Milk Co., supra,* which arose under the New Jersey milk statute, the following appears:

''And the claim that the prescription of minimum prices 'without an investigation by the control board of the milk industry and without notice to the defendant or opportunity afforded it to be heard,' constituted a deprivation of constitutional rights is likewise untenable. In the absence of a specific constitutional or statutory requirement thereof, notice of proceedings before the subordinate body exercising, as here, the administrative function is not requisite to valid action by that body. Nor is a hearing required in the absence of a provision therefor in the organic or statutory law. The due process clause of the Fourteenth Amendment imposes no such requirement; and, for obvious reasons, the like clauses in the state constitution bear the same construction.

''As pointed out, the respondent board merely exercises the administrative function to effectuate the definitely declared legislative policy. Such regulation is purely a legislative function; and, even when exercised by a subordinate body, upon which it is conferred, the notice of hearing essential in judicial proceedings is not indispensable to a valid exercise of the power. If the regulation undertaken is arbitrary or unreasonable, and, in the case of rates and charges imposed upon a business clothed with a public interest, confiscatory, relief may be had in the courts. A judicial review of administrative proceedings, on notice, satisfies the demand of the due process clauses. *Home Telephone, etc., Co.,* v. *Los Angeles,* 211 U. S. 265, 29 S. Ct. 50, 53 L. Ed. 176. The principle of due process is to secure the citizen against the exercise of arbitrary power. 'The omission [in a statute conferring such power upon a public utility commission] of the requirement of notice assimilates the procedure of the Commission to that characterizing legislative action, and it is justified and sustained by those reasons of public policy upon which notice is dispensed with in legislation.' *Randall Gas*

*Co.* v. *Star Glass Co.*, 78 W. Va. 252, 88 S. E. 840, 842. See, also, 12 C. J. 1240, 1268, 1269, 1282; 51 C. J. 57.

"The statute here. imposes no such requirement. The board may, in its discretion, hold a public hearing . . . and invite producers, consumers, local dealers, and public health officials in this State, to submit such proofs as they may desire to aid the board in making its determination hereunder.' N. J. St. Annual 1933, sec. 81—162A (31). The presumption arises that the order made is a reasonable and valid exercise of the authority conferred; and the burden of establishing the contrary is upon him who asserts it."

*Baldwin* v. *Dellwood Dairy Co.*, 150 Misc. 762 [270 N. Y. Supp. 418, 421, 422], contains the following:

"First, it is urged that the Board before making orders 32, 34, and 35, failed to make the investigation required by the statute and failed to give the reasonable notice required thereby; and that the investigations made and hearings held by the Board failed to justify the prices fixed in said orders; and that the said orders were not issued pursuant to the requirements of the statute and were null and void.

"The presumption is that the Board did its duty in the emergency efforts required of it in the making of investigations, giving notice of hearings, conducting the hearings, and making such orders. Such presumption was not overcome so far as the original validity of such orders was concerned. The Board had the benefit of the voluminous and carefully prepared report of the Joint Legislative Committee to Investigate the Milk Industry (known as the Pitcher Report) which recommended this emergency legislation. The Board had been investigating for three months and had held a number of hearings and had issued a number of orders before the hearing of July 14, 1933, after which orders 34 and 35 were promulgated, effective July 21, 1933. The statute section 312 (f), provides for reasonable notice to all parties interested and to the public of a hearing before making an order fixing prices, such notice to be given 'in such newspaper or newspapers as in the judgment of the board shall afford sufficient notice and publicity.' This hearing of July 14th was for the purpose of 'supplementing, altering, revising and/or amending any and all official orders heretofore promulgated,' and was so noticed on July 11th by posting in the main office of the Board and by news release to the press. . . . *Whether the hearing of July 14th failed to justify the*

*prices fixed in orders 34 and 35 should not be determined upon the record of the hearing alone. The Board had before it the data of its own investigations. . . .* At most the courts could hold only that the Board acted arbitrarily or capriciously. They could not substitute their judgment for that of the Board. I cannot say that the Board acted arbitrarily.''

The case of *Colteryahn Sanitary Dairy* v. *Milk Control Com.,* 332 Pa. 15 [1 Atl. (2d) 775, 122 A. L. R. 1049], cited by respondents, recognizes the right of the appropriate commission or director to make independent surveys and investigations but declares that the result thereof should be placed in evidence at the hearings. Aside from differences in the statutes there and here involved, the case was principally concerned with the practice of interested persons withholding evidence before the commission and thereafter attempting to use the same on the direct appeal there allowed. That case does not intimate that all information and data obtained by the commission as a result of independent investigation must be placed in the record but only the ''result'' thereof. In effect, that was done here. While the director did not offer in evidence at the several hearings every book, pamphlet, government labor and agricultural report, statistical table, cost study, etc., he did, in substance, place before each hearing the ''result'' of his investigations and surveys, and the expert assistant (Dr. Tinley) who had made the same was available and was in many instances subjected to examination by those present at the hearings.

 As already stated, we are of the view that the notices given of and the hearings conducted by the director with respect to the matters included in the several orders above designated, sufficiently satisfied all statutory and other appropriate requirements. Under the foregoing authorities, and others cited earlier in connection with our discussion of the validity of the petition for formulation of a marketing plan, we cannot say that the action of the director in any particular has been arbitrary, capricious or so entirely lacking in evidentiary support as to warrant judicial interference with his several orders. In an action of this character challenging proceedings and hearings of the type here involved, it is not for the courts to *weigh* the evidence and data adduced before and considered by the director preliminary to his issuance of the several orders here challenged. Under the circum-

stances here present, judicial interference should occur only when it can be said that administrative action has been arbitrary and capricious. (*Silberchein* v. *United States, supra; Union Transp. Co.* v. *Bassett, supra.*) As stated in *Maxwell* v. *Civil Service Com., supra,* ''Courts should let administrative boards and officers work out their problems with as little judicial interference as possible. . . . Such boards are vested with a high discretion and its abuse must appear very clearly before the courts will interfere.'' This same thought found expression very recently in the decision of the United States Supreme Court in *Federal Communication Com.* v. *Pottsville Broadcasting Co.,* 309 U. S. 134 [60 Sup. Ct. 437, 443, 85 L. Ed. 656] (Jan. 29, 1940), wherein it is declared that ''Interference by the courts is not conducive to the development of habits of responsibility in administrative agencies. Anglo-American courts as we now know them are themselves in no small measure the product of a historic process.'' It clearly appears from the record herein that the proper discharge of the functions confided by the legislature to the discretion of the director, within the standards prescribed by the statute, and particularly the establishment of minimum wholesale and retail prices, involve highly technical matters requiring the assistance of skilled and trained experts and economists and the gathering and study of large amounts of statistical data and information. It is apparent from the record herein that the Department of Agriculture, with the assistance of its experts, had exhaustively explored appropriate fields before proceeding. It is impractical to here attempt an outline of the evidence adduced at the hearings or of the data and information collected by the director and which constituted the bases upon which his several orders were made to rest. At the hearing on order No. 40, fixing minimum wholesale and retail prices, the director stated that the data and information collected by him and his experts were open and available to all present who desired to delve into the same. The testimony at this hearing of Dr. Tinley, an economist and milk expert from the University of California, who throughout the proceedings conducted in the Los Angeles area, advised and consulted with the director, definitely tends to indicate that the then proposed order No. 40 was not the result of arbitrary action but, in fact, was the aftermath of much investigation and study of facts pertinent to such price fixing order. His testimony (and he

was subjected to examination by persons present, including some of the respondents herein) and the other evidence, including exhibits, adduced at this hearing and occupying several hundred pages of transcript, cannot here be set forth. It should be stated, however, that it appears that the problem of fixing prices of milk is tremendous and highly technical because of the many types of distribution employed and the various sizes of containers used. As stated in *Nebbia* v. *New York,* 291 U. S. 502, 539 [54 Sup. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469], ''Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty.'' In this connection, we are satisfied that the director complied with all requirements specified in the act and we cannot say, nor did the trial court find, that the director acted arbitrarily or capriciously at any time during the proceedings.

We find no merit in respondents' assertion that irreparable injury has and will result to them under ''General Order No. 40''. Aside from the fact that some of them generally so testified (without producing their records to support the same, and on cross-examination their testimony was considerably weakened), it appears that the allegations of their complaint specifically alleging irreparable damage were found by the trial court to be untrue. In addition to other matters, paragraphs XXI and XXII of this complaint alleged, in substance, that ''General Order No. 40'' establishing minimum wholesale and retail prices would, if continued in effect, cause damage and destruction to the business of many of the respondents to their great and irreparable injury. Paragraph XXVIII of the complaint alleged, in part, that said order would preclude the consumer-respondents from purchasing adequate quantities of milk. All three of these specific allegations were found by the court below to be untrue and respondents not having appealed may not here challenge them. The only other reference to the subject appears in ''Finding XXV'' which merely finds ''That the allegations contained in paragraph XXIX of plaintiffs' complaint are true.'' Inspection of said paragraph of the complaint discloses that it merely alleges that the director, unless restrained, threatens

to enforce against plaintiffs, to their alleged irreparable damage, the stabilization plan formulated by him, including order No. 40, "notwithstanding that all of said acts and threatened acts" of the director "are in violation of the laws and Constitution of the State of California and of the Constitution of the United States". It is immediately apparent that this allegation of irreparable damage, and the finding thereon, are not addressed to asserted damage that may result from the minimum prices prescribed in order No. 40, but, on the contrary, are based on the proposition that damage will result from the enforcement of a stabilization plan alleged and found to be the creature of an unconstitutional statute. This allegation and finding must necessarily fall with the findings, already shown to be without support, that the statute, and consequently everything done thereunder by the director, run counter to constitutional inhibitions. The statute and the plan here formulated being valid, no damage can be said to result from the enforcement of an asserted void plan created under an alleged unconstitutional statute.

What we have said earlier in this opinion upon the same subject in our discussion of the constitutionality of the act, necessarily disposes of the allegation and finding of monopoly will result from the asserted fact that distributors may use all of the milk of certain producers as class 1 milk while that of others may be relegated by them to the lower classes bringing a smaller return. The discussion on this subject above appearing need not here be repeated. It discloses the finding and respondents' contention in connection therewith to be wholly without support.

We have attempted to discuss and dispose of all material contentions and findings. Obviously, because of the great number thereof we cannot here refer to them all in detail. Those not specifically mentioned are either sufficiently covered by and included in what we have said or are so lacking in merit and support as not to require further attention. We are satisfied that the trial court clearly erred in permanently enjoining the appellant director from proceeding in the Los Angeles area under the act and under the stabilization plan theretofore proposed, adopted and declared effective by him in said area. The decree must, therefore, be reversed. The petition of the appellant director for a writ of *supersedeas*

pending determination of this cause on appeal, and continued with the merits, necessarily becomes moot.

The petition for *supersedeas* is denied. The judgment is reversed with directions to the court below to proceed in accordance with the views herein expressed.

Shenk, J., Waste, C. J., Gibson, J., and Carter, J., concurred.

EDMONDS, J., Dissenting.—I do not know, nor do I consider it the judicial function to decide—as the majority of this court has done—that "producers and distributors of milk and the consuming public will benefit more under the protective wing of the act than they did under the destructive practices and influences" of free competition in the milk industry. Price fixing legislation is still in an experimental stage, and its ultimate worth as an economic policy is a question for the people of the state to decide. This court's only duty is to determine whether the legislature, in the particular instance, has dealt with this complex subject within the bounds of organic law and whether the officers entrusted with its administration have followed the authority committed to them.

I am of the opinion that in one provision of the present Milk Control Act the legislature has surrendered too large a share of its powers to administrative action. It may be conceded that a legislative body may delegate to administrative officers the authority to determine facts which will put enactments into effect. (*Dominguez Land Corp.* v. *Daugherty,* 196 Cal. 468 [238 Pac. 703]; *Brock* v. *Superior Court,* 9 Cal. (2d) 291 [71 Pac. (2d) 209, 114 A. L. R. 127]; *Field* v. *Clark,* 143 U. S. 649 [12 Sup. Ct. 495, 36 L. Ed. 294]; *Hampton & Co.* v. *United States,* 276 U. S. 394 [48 Sup. Ct. 348, 72 L. Ed. 624]) and to devise rules and incidental regulations which are necessary to implement and make effective the more general powers conferred. (*United States* v. *Shreveport Grain & Elevator Co.,* 287 U. S. 77 [53 Sup. Ct. 42, 77 L. Ed. 175]; *United States* v. *Grimaud,* 220 U. S. 506 [31 Sup. Ct. 480, 55 L. E... 563].) But the purpose which the legislature seeks to accomplish and the standards by which that purpose is to be made effective must be stated with sufficient exactness to enable both the administrative agency and those affected by the law to understand the limits of administrative authority.

(*Tarpey* v. *McClure,* 190 Cal. 593 [213 Pac. 983]; *People* v. *Parks,* 58 Cal. 624; *Schechter Corp.* v. *United States,* 295 U. S. 495 [55 Sup. Ct. 837. 79 L. Ed. 1570, 97 A. L. R. 947].) Undefined authority is objectionable not only because it may be abused, but also because it is referable to no legal standard by which abuse may be controlled.

By section 736 of the Milk Control Act, the director of agriculture is authorized to designate marketing areas "which he deems necessary or advisable to effectuate the purposes of this chapter and wherein he finds the conditions affecting the production, distribution and sale of fluid milk, fluid cream, or both reasonably uniform". To my mind, this standard is so vague as to constitute no standard at all. The enforcement of the act in any particular area of the state and the determination of the size and location of such an area are matters which have been committed entirely to the unfettered discretion of the director. That such a delegation of power is unlawful seems to me to be too clear for argument. I am, therefore, of the opinion that the decision on this point in *Jersey Maid Milk Products Co.* v. *Brock,* 13 Cal. (2d) 620 [91 Pac. (2d) 577], is not in accordance with established law and should be overruled.

I also believe that in the conduct of the hearing upon order No. 40, by which minimum wholesale and retail prices were established, the director did not regularly pursue the authority conferred upon him by the act. The opinion of the majority of the court shows that in this hearing, as in the others, the director did not conceive it to be his duty to introduce any evidence to support the findings and order which he afterwards promulgated; in fact he refused to do so.

At the hearing which the director called, counsel for the milk producers requested "that the Department put on its case briefly or *in extenso* so that we may have some appreciation of how these prices and regulations were arrived at and be prepared to answer them". To this request the director replied: "The Department has made a study of this particular area. We have with us information which you may delve into if you like. If you don't oppose the Plan at this hearing, or call upon us to give evidence upon some particular point that you want, I can see no object in that. We will just waste that much time, whereas if we can get your objection then we might be able to meet it. I think we will save time

by having your man take the witness stand, or you take it, and make the proposals at this time, and let us consider them. Then if you want to know why we arrived at the procedure or the particular section of the Plan you have in mind, we will be glad to show you why.''

To be sure, the director declared that his files were open for the examination of any one interested, and he invited those present to offer suggestions, objections or evidence concerning the proposed order. Moreover, the director's experts, who had worked up the evidence upon which the order was based, were available for questioning by interested objectors, and through this opportunity a considerable amount of evidence of a desultory nature was extracted. But the fact remains that the director refused to present, even in a general way, the foundational facts upon which his specific findings and order were based.

The majority of the court justifies this procedure by calling the present hearing a ''legislative'' as distinguished from a ''judicial'' or ''*quasi*-judicial'' hearing, from which it would follow that a hearing could be dispensed with entirely. To support this conclusion their opinion quotes at some length from *Norwegian Nitrogen Products Co.* v. *United States,* 288 U. S. 294 [53 Sup. Ct. 350, 77 L. Ed. 796], ''*The Assigned Car Cases*'', 274 U. S. 564 [47 Sup. Ct. 727, 71 L. Ed. 1204], *Highland Farms Dairy* v. *Agnew,* 16 Fed. Supp. 575, *State Board of Milk Control* v. *Newark Milk Co.,* 118 N. J. Eq. 504 [179 Atl. 116], and *Baldwin* v. *Dellwood Dairy Co.,* 150 Misc. 762 [270 N. Y. Supp. 418]. These cases may be authority for the proposition that the legislature in drafting the present law was not required under the due process clause to provide for a full judicial hearing, but not one of them justifies the interpretation given the statute now before the court.

For example, *Norwegian Nitrogen Products Co.* v. *United States, supra,* involved provisions of the Tariff Act of 1922 which required the tariff commission to make investigations and hold private hearings and report to the President upon proposed changes in tariff rates. It was held that in view of the history and background of the statute, the provision for a hearing did not require the commission to disclose secret trade information furnished to it in confidence. The decisions requiring public utility commissions to hold full public hearings in the exercise of their rate-making power were dis-

tinguished in this way: "The Tariff Commission advises; these others ordain. There is indeed a common bond that all alike are instruments in a governmental process which according to accepted classification is legislative, not judicial [citing cases]. Whatever the appropriate label, the kind of order that emerges from a hearing before a body with power to ordain is one that impinges upon legal rights in a very different way from the report of a commission which merely investigates and advises. . . . The Commerce Act, as it stands today, and kindred statutes in the states, are instinct with the recognition of a duty to give a hearing of such a kind that the courts will understand why a Commission has acted as it has if their supervisory powers are afterwards invoked for enforcement or revision. No such inference is to be drawn from the act now before us."

In the present case the director ordains; he does not advise. Moreover, the California Milk Control Act, like the public utility rate-fixing statutes, and unlike the Tariff Act of 1922, contemplates a judicial review of the administrative orders. For these reasons, in my judgment, the present case should be decided in accordance with the principles in such decisions as *Morgan* v. *United States*, 298 U. S. 468 [56 Sup. Ct. 906, 80 L. Ed. 1288], *St. Joseph Stock Yard Co.* v. *United States*, 298 U. S. 38 [56 Sup. Ct. 720, 80 L. Ed. 1033], and *Morgan* v. *United States*, 304 U. S. 1 [58 Sup. Ct. 773, 999, 82 L. Ed. 1129], in which administrative action impinged directly upon legal rights through the fixing of rates for personal services. Assuming, however, that the regulation of the milk industry stands upon a different footing (*Nebbia* v. *New York,* 291 U. S. 502 [54 Sup. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469]), the decisions of other jurisdictions interpreting particular milk control laws are not authority for a decision construing the very different terms of the California statute which contemplates the introduction of evidence by the director of agriculture to support an administrative order.

In the promulgation of an order establishing minimum wholesale and retail prices, the director is required first to investigate cost conditions in the distribution of milk and then after giving appropriate notice to "hold one or more public hearings, take testimony and may subpoena witnesses". All testimony received must be given under oath. A record of the proceedings must be kept and made available for the in-

spection of any interested person. The director is then required to make written findings determining that the prices which he proposes to establish comply with specified conditions and standards. All of these steps are conditions precedent to the issuance of the administrative order (sec. 736.12). Once made, such an order may be reviewed by any court of competent jurisdiction at the suit of any party substantially affected (sec. 735.6).

In my opinion these provisions clearly contemplate that no order shall be made by the director unless he shall present affirmative proof of facts justifying some action by him, and the particular requirements later made by his order must be reasonably supported by that evidence and any which may be offered in opposition to it. Any other procedure makes an empty form of the requirement for a hearing and an order based upon evidence and specific written findings. Moreover, it is only through such procedure that efficient judicial review of administrative orders may be had. As the court pointed out in *Norwegian Nitrogen Products Co.* v. *United States, supra,* an administrative hearing should be of ''a kind that the courts will understand why a Commission has acted as it has''. If no evidence is introduced at the hearing, a reviewing court cannot decide whether a challenged order was justified unless there is produced before it the evidence which the administrative officer should have heard. The point finds apt illustration in the present proceedings.

Complaint is made that the retail carry-out price fixed by order No. 40 with respect to sales of milk in gallon lots is discriminatory because the differential is too slight between that price and the retail delivered price per gallon. Retailers who sell to the consumer at their stores in gallon lots claim that they cannot stay in business unless they can sell at a price substantially below the delivered price. There is some suggestion in the administrative record that the director was unable to secure cost statistics from gallon-lot retailers; at least there is no affirmative proof that the retail carry-out price per gallon was fixed with reference to the costs of such retailers. Section 736.12 requires that each particular price be ''sufficient, but not more than sufficient, to cover all necessary costs, according to the method or type of distribution''. But upon the record made, no reviewing court can determine

whether the director complied with the statute in this particular.

For these reasons, I am of the opinion that the judgment should be affirmed.

Rehearing denied.