[Civ. No. 14348.   First Dist., Div. Two.   Nov. 30, 1950.]

MARIN DAIRYMEN'S MILK COMPANY, LTD., Respondent, v. A. A. BROCK, as Director of Agriculture, etc., Appellant.

Fred N. Howser, Attorney General, Walter L. Bowers, Assistant Attorney General, and W. R. Augustine, Deputy Attorney General, for Appellant.

Sullivan, Roche, Johnson & Farraher for Respondent.

SCHOTTKY, J. pro tem.—This is an appeal by the defendant, A. A. Brock, as Director of Agriculture of the State of California, from a judgment overruling defendant's demurrer to plaintiff's amended complaint and ordering declaratory relief in favor of plaintiff and against the defendant with regard to the milk stabilization law (Agr. Code, div. 4, ch. 13) and the Stabilization and Marketing Plans hereunder for the San Francisco Marketing Area.

The matter was heard in the lower court upon plaintiff's amended complaint and defendant's demurrer thereto, a written stipulation having been filed that the facts alleged in the amended complaint were true and that the question as to whether plaintiff was entitled to declaratory relief was properly raised by the demurrer.

The question involved in this appeal is whether a distributor of fluid milk may refuse to pay the minimum Class 1

price established under the Stabilization and Marketing Plan for the area in which the milk is sold to producers whose milk was sold and used as Class 1, simply because the distributor had the right to sell and use that particular milk for the lower price Class 4, notwithstanding the fact that it did not actually do so, but, instead, by means of entries in its books and records stated, contrary to the fact, that it had sold and used such milk in Class 4.

Before discussing this question we shall summarize the factual situation as shown by the amended complaint:

Respondent is a domestic corporation with its principal place of business in the city and county of San Francisco. At all of the times involved herein it has been a "distributor" of fluid milk as that term is defined in section 735.3 of the Agricultural Code of this state, and has been duly licensed as such. It has held separate distributor's licenses for each of its distributing plants located in San Francisco, in San Mateo, and in Hughson, Stanislaus County, California.

Under the provisions of said Milk Stabilization Act, and particularly section 736 of the Agricultural Code, there have been "marketing areas" duly established and existing in the State of California, among which are the San Francisco Marketing Area consisting of the city and county of San Francisco, and the Stanislaus County Marketing Area consisting of the county of Stanislaus. In each of these marketing areas there has been at all times involved herein a stabilization and marketing plan in force and effect under the provisions of said Milk Stabilization Act establishing minimum prices to be paid to producers.

Respondent supplies its wholesale customers and other distributors with approximately 25 per cent of all the bottled and packaged milk and cream (Class 1 and Class 2) used in the San Francisco Marketing Area. In order to retain such customers it must be prepared to supply their demands throughout the year.

There is no milk produced in the San Francisco Marketing Area itself, and the bulk of the supply for that area is obtained from adjacent counties, principally from Marin County. Respondent has contracted with some 71 milk producers in such adjacent counties for the delivery of their milk to respondent at its plant in San Francisco.

Respondent has in a similar manner contracted with some 48 milk producers in Stanislaus County to deliver all of their

milk to respondent at its plant in Hughson in Stanislaus County.

All of such contracts provide that the respondent will pay to the producer the Class 1 price for a certain specified amount of such milk delivered, which is termed the "quota" milk, also known as "contract" milk; and that for all milk delivered by the producer in excess of such "quota" milk, which excess is known as "surplus" milk, the respondent will pay the Class 4 price, *unless* such "surplus" milk is used in some other class, in which event such "surplus" milk shall be paid for *according to its usage.*

The production of fluid milk in the counties adjacent to the San Francisco Marketing Area is at its minimum during the months of August, September, October and November in each year. Respondent, and most other distributors in the San Francisco Marketing Area, base the amount of "quota" milk contracted for on the average daily production of the producer during such months of August, September, October and November of the previous year.

During those months the amount of "quota" milk purchased from the producers adjacent to the San Francisco Marketing Area and delivered at respondent's San Francisco plant is insufficient to supply the demands of its customers in that marketing area for Class 1 and Class 2 fluid milk. At such times respondent uses for such Class 1 and Class 2 purposes whatever portion of the "surplus" milk of such producers as is required to supply its demand for Class 1 and Class 2 usage.

During such months the total amount of the "quota" and "surplus" milk of the producers adjacent to San Francisco Marketing Area and delivered to respondent's plant in San Francisco may be insufficient to supply the demands of respondent's customers in the San Francisco Marketing Area for Class 1 and Class 2 milk. In order to assure an ample and abundant supply of fluid milk for Class 1 and Class 2 usage in the San Francisco Marketing Area at all times, respondent has contracted with the producers mentioned in the Stanislaus County Marketing Area for an amount of "quota" milk considerably in excess of its needs for Class 1 and Class 2 usage in the Stanislaus County Marketing Area. The amount of such "quota" milk purchased and delivered in the Stanislaus County Marketing Area in excess of its Class 1 and Class 2 usage in that area and in excess of the amount thereof actually shipped to the San Francisco Marketing Area

when required, is sold and disposed of to other distributors or used in Class 3 and Class 4.

Beginning October 1, 1947, whenever the supply of "quota" milk received by respondent at its San Francisco plant from the producers adjacent to the San Francisco Marketing Area has been insufficient to supply its Class 1 and Class 2 usage and respondent has used the "surplus" milk of such producers for Class 1 and Class 2 usage, it has failed to pay such producers the established minimum Class 1 and Class 2 price for such "surplus" milk according to its usage. Instead it has paid such producers only the lesser minimum Class 4 price for such "surplus" milk actually used in Class 1 and Class 2. It has sought to justify this by making entries in its books and records indicating the shipment from its San Francisco plant to its plant at Hughson of the "surplus" milk of its San Francisco producers (actually used in San Francisco as Class 1 and Class 2) and indicating the use of such "surplus" milk in the Stanislaus County Marketing Area as Class 4. By like entries it has indicated the shipment from its plant at Hughson to its San Francisco plant of an equal amount of the "quota" milk of its Stanislaus County producers and indicated the use of such "quota" milk in San Francisco as Class 1 and Class 2 milk.

Respondent is not prohibited by law from *actually* transporting such milk from its plant in San Francisco to its plant in Hughson and vice versa, but it does not *actually* transport such milk for the reason that the cost of such transportation would be uneconomical, to wit, approximately 35 cents per can of 10 gallons, or 86 pounds.

Appellant has demanded that respondent pay to all producers from whom it has received fluid milk in the San Francisco Marketing Area not less than the established minimum price in effect in said marketing area for all such fluid milk actually sold and used in said area in accordance with the actual usage of such milk, as Class 1, Class 2, Class 3, or Class 4; and asserts that the provisions of the Milk Stabilization Act and the terms of the Stabilization and Marketing Plan for the San Francisco Marketing Area require such payment.

Appellant's first contention is the court erred in concluding that neither the Milk Stabilization Law nor the Stabilization and Marketing Plan for San Francisco required the distributor to pay the producer the established minimum price according to the class in which the producer's milk was sold.

The judgment of the trial court is based in part upon the following conclusion of law:

"I

"Defendant is in error in his contention described in Paragraph XVII of the Amended Complaint, that the provisions of the Agricultural Code of the State of California or the provisions of the Stabilization and Marketing Plan in effect in said San Francisco Marketing Area require that plaintiff pay to producers adjacent to the San Francisco Marketing Area the price fixed by defendant for fluid milk used for Class 1 and 2 purposes, for fluid milk purchased as 'surplus' milk from said producers and used for Class 1 and 2 purposes in the San Francisco Marketing Area, and forbid plaintiff from offsetting by book entries said 'surplus' milk, so purchased from the producers adjacent to the San Francisco Marketing Area, against a similar quantity of 'quota' milk purchased by plaintiff in the Stanislaus County Area, for which plaintiff paid the price fixed by defendant for the sale of fluid milk for Class 1 and 2 purposes.

"II

"It is true as alleged in Paragraph XVIII of plaintiff's Amended Complaint that plaintiff during the period described in plaintiff's Amended Complaint was lawfully entitled to make a physical exchange of its 'surplus' fluid milk purchased from producers in the area adjacent to San Francisco and received at its plant in the San Francisco Marketing Area for an equivalent amount of 'quota' milk purchased from producers in the Stanislaus County Area, and to then sell said 'quota' milk in the San Francisco Marketing Area for Class I and II purposes, without incurring any liability to pay to the said producers adjacent to the San Francisco Marketing Area the difference between the price for 'surplus' milk and the price for 'quota' milk in said marketing area.

"And it is true, as contended for by plaintiff in paragraph XVIII of the amended complaint, that plaintiff, without violating the law or the provisions of the Agricultural Code or of the Stabilization and Marketing Plan in effect in said San Francisco Marketing Area, can, and did, during the period described in the amended complaint, make said exchange by entries upon its books without the transporting of the 'quota' milk from said Stanislaus County Area to the San Francisco Marketing Area, and can sell said 'surplus' milk purchased from the producers in the area adjacent to the San Francisco

Marketing Area for Class 1 and 2 purposes without any obligation to pay to said producers any moneys beyond the price paid for said milk as 'surplus' milk.—so provided in the contracts with said producers.''

Agricultural Code, section 735.3(b), as it read during all times mentioned in the complaint, defined Class 1 milk as follows: ''Class I. Any such milk that is supplied to consumers in the form of whole milk, which shall include 'raw milk'; 'pasteurized milk'; 'homogenized milk'; 'condensed milk', 'evaporated milk', 'modified milk', etc.'' This section has since been amended (Stats. 1949, ch. 1400, § 1, in effect October 1, 1949), but that part of the statute which defines Class 1 milk as certain forms of fluid milk ''supplied to consumers'' remains the same. From its inception to date Agricultural Code, section 735.3(b), has defined Class 1 milk as ''milk that is supplied to consumers'' in certain designated forms.. Thus by express definition of the Agricultural Code that milk is Class 1 milk *which is supplied to consumers* (in certain forms). Such is the ''surplus'' milk of the Marin producers which was actually devoted to Class 1 usage in the San Francisco area.

Agricultural Code, section 735.3(i) provides: '' 'Stabilization and marketing plan' means any plan formulated and made effective by the director within the legislative standards provided by this chapter and shall include, among other things, the establishing of prices to be paid by distributors for any or all of the various classes of fluid milk or fluid cream.''

Pursuant to this unquestioned authority to fix the prices to be paid for Class 1 milk, appellant has provided in his Stabilization and Marketing Plan a definition of Class 1 milk, and the price to be paid therefor. Class 1 milk is defined as follows: '' 'Class 1,' means milk that is supplied to consumers in the form of . . .'' Article I, section A, provision 1 of the Plan established the minimum price for Class 1 milk as follows: ''Each distributor within this State, who receives or otherwise handles (Class 1 and/or Class 2) fluid milk for distribution within the San Francisco Marketing Area, . . . shall pay to producers for all such . . .'' (at the minimum established price).

Class 1 milk is thus clearly defined as that milk which ''is supplied to consumers'' in certain forms. This milk must be paid for at the minimum Class 1 price. Interpolating the definition of Class 1 milk into the provision establishing minimum prices to be paid, the Stabilization and Marketing

Plan requires that each distributor within this state who receives or otherwise handles *milk that is supplied to consumers* (in certain forms) or distribution within the San Francisco Marketing Area shall pay for it at the established minimum Class 1 price.

Obviously the surplus milk of the Marin producers, actually devoted to Class 1 usage in the San Francisco Marketing Area, is ''milk that is supplied to consumers'' in the designated forms. By definition of the plan then, this milk was Class 1 milk. Class 1 milk must be paid for at the established minimum Class 1 price, according to the explicit requirements of the Stabilization and Marketing Plan.

Respondent argues that because it was lawfully entitled to actually transport such ''surplus'' milk from San Francisco to its plant in Stanislaus County and use it there as Class 4 milk (even though it did not do so because of the transportation costs involved), it was entitled to pay only such Class 4 prices by means of entries on its books which indicated (contrary to the fact) the actual transportation of such surplus milk from San Francisco to Hughson in Stanislaus County and the use there of such milk for Class 4 purposes.

The constitutionality of the Milk Stabilization Act has been established in several California decisions. (See *In re Willing*, 12 Cal.2d 591 [86 P.2d 663] ; *Jersey Maid Milk Producers Co. v. Brock*, 13 Cal.2d 620 [91 P.2d 577] ; *Ray* v. *Parker*, 15 Cal.2d 275 [101 P.2d 665].) Respondent concedes this and makes no attack upon either the act or the Stabilization and Marketing Plan. However, respondent argues that one of the purposes of the act was to insure an adequate supply of milk and to foster orderly marketing and eliminate waste, and that it would be sheer waste to compel respondent to transport its quota milk to San Francisco in order to avoid paying the Marin County producers the Class 1 price for their surplus milk used as Class 1. Appellant concedes that the purpose of the act was stated by respondent but argues that the method used by respondent is not only contrary to the purposes of the act but is contrary to the plain language of the Stabilization and Marketing Plan which requires a distributor to pay a producer not less than the established minimum price for his milk according to its actual usage.

We do not believe that any useful purpose will be served by a discussion of economic phases of the question involved. Much stress was placed on these economic factors by counsel in their briefs and by the trial court in its memorandum

opinion. We are impressed with the statement of the court in *Queensboro Farm Products* v. *Wickard,* 137 F.2d 969, 980, that "that interpretations of a statute by officers who, under the statute, act in administering it as specialists advised by experts must be accorded considerable weight by the courts. If ever there was a place for that doctrine, it is, as to milk, in connection with the administration of this act, because of its background and legislative history." We are inclined to believe that respondent agricultural director, who is the person empowered by the act to formulate and establish a Stabilization and Marketing Plan, is in a far better position than either respondent or the court to determine the economic phases involved.

We are convinced that both the state and the Stabilization and Marketing Plan require distributors to pay a producer not less than the established minimum price for his milk according to its actual usage.

Appellant contends further that the court erred in holding that the contracts justified the payments made to the producers by respondent.

The trial court construed respondent's contracts with its producers as follows: the contracts ". . . do not contemplate that plaintiff shall pay for, at Class 1 . . . price, any 'surplus' or non-'quota' milk, until plaintiff has exhausted the equivalent in volume of all 'quota' milk received by it from all producers from both producing areas." Further, that the practice of respondent's fictitious entries has, as its only effect "to save plaintiff the expense of shipping the 'quota' milk from Hughson to San Francisco," and that this practice ". . . is in the interest of economical marketing of milk, eliminates waste and is lawful, and plaintiff should be commended rather than penalized for so doing."

As can be seen, the trial court agreed with respondent's contention that the contracts with all producers authorized the pooling of *all* of the milk of *all* of its producers from both areas. It is appellant's contention that the contracts authorize pooling only of the milk of producers from the same area, i. e., the milk of Marin producers may be pooled with the milk of other Marin producers, and the milk of Stanislaus producers may be pooled only with the milk of other Stanislaus producers. Appellant points out that the trial court based its judgment in part upon a finding that, "The contracts entered into by plaintiff with all of the producers from which it purchases milk are identical in their provisions except as to the names

of the contracting producers, the dates of the contracts and the amounts of 'quota' milk purchased.'' Appellant then points out that the contracts sufficiently differ in other respects to justify his contention that pooling was contemplated in the contracts only with producers from the same area. It is respondent's position that the provisions with respect to ''quotas,'' ''surplus,'' and pooling are identical, and that these other differences are ''immaterial'' variations.

Both contracts have identical pooling provisions, providing: ''All milk delivered in excess of said ('quota' milk) shall be pooled with all milk in excess of quotas received from all other producers; and shall be paid for at the Class 4 price, unless used in one of the other classes, . . .'', and, ''The total amount of milk in which is contained the milkfat that is above contracted to be pooled ('surplus' milk) with other producers' milk shall at all times be deemed to have been pooled under the above terms and conditions whether or not the producer's particular deliveries are in fact pooled and also irrespective of the actual use to which the above producers milk is put.'' Obviously the references to pooling refer only to the pooling of ''surplus'' milk. The provision for deeming the milk pooled, whether actually done so or not, indicates that it is desired by the parties that if any of the ''surplus'' milk is used for Class 1 purposes, for which a ''blended'' price will be paid, *all* of the producers will share equally in this increased price whether or not *their* milk was actually used, i. e., whether or not it was actually pooled with the surplus milk actually used.

We find nothing in the contracts to justify the trial court's conclusion, and respondent's contention, that respondent and producers did not contemplate that any surplus milk would be paid for at Class 1 prices unless and until *all* ''quota'' milk contracted for in both areas had been used. We believe that a careful analysis of the contracts lead to the conclusion that respondent had a right to pool all of the milk of all of the producers of each marketing area without regard to whether or not such milk was ''quota'' or ''surplus'' milk but that respondent did not have the right to pool all of the milk of all of the producers from both areas. We agree with appellant's contention that the contracts do not justify the construction placed upon them by the trial court, and that if they were susceptible of such a construction, such a provision would be invalid as being contrary to the law and the Stabilization and Marketing Plan.

The contracts differ in the following respects:

(1) The Stanislaus contract is marked "Hughson" (location of respondent's Stanislaus area plant) in the upper right hand corner of the first page. The Marin contract contains no designation of the respondent's plant referred to in the contract. The amended complaint discloses that Marin producers delivered to respondent's San Francisco plant and Stanislaus producers delivered to respondent's Stanislaus county plant at Hughson.

These facts assume importance in that both contracts provide for payment to producers of a Class 4 price for deteriorated milk products which have no salvage value, and provide for payment, at a determined price, for "all other plant losses." These provisions are provided for under the heading "PLANT LOSSES" in both contracts.

This indicates that the contractual provisions as to plant losses, *and*, necessarily as to "pooling" and "other producers," refer to producers contributing milk to the same plant as does the producer who enters into the contract with respondent. The producers certainly could not have contemplated that they would share in "plant losses" of the respondent, occurring in all of respondent's plans wherever they might be located.

(2) The Marin contract provides that ". . . all milk sold outside the San Francisco marketing area . . . shall be Classified in one . . . of the classes established by the Agricultural Code . . ." Then, under the heading "PRICES," the Marin contract provides: "For all milkfat sold in the San Francisco marketing area the distributor shall pay . . ." certain prices. And, "for all milkfat contained in milk sold or used . . . outside the San Francisco marketing area . . ." the producer shall be paid the prevailing price in that area.

The Stanislaus contract, in lieu of the above provisions provides: "All milk sold shall be classified in one . . . of the classes established by the Agricultural Code of the State of California." And, under "PRICES," "For all milkfat sold in the several classes in any marketing area the distributor shall pay the producer in the manner above set forth at the prices . . ." established by the Director, or prevailing in the area.

(3) The Marin contract has a provision as follows: "The distributor is hereby authorized to deduct from monies due the producer contributions . . . (in a certain amount) . . . as are deemed necessary to promote the increased consumption of milk in the San Francisco marketing area by a Milk In-

dustry Advertising Committee composed of representative distributors in, and representative producers shipping to, the San Francisco marketing area.''

The above provision, or any similar provision, is entirely lacking in the Stanislaus contracts. Thus we have all of the Marin producers contributing to a fund to be used in fostering the increased consumption of milk in the San Francisco area. This fund is administered by a committee composed of ''representative'' distributors in, and ''representative'' producers shipping to, the San Francisco Marketing Area. Several logical inferences may be drawn from the inclusion of the above provision in the Marin contracts, and its absence in the Stanislaus contracts. It may be inferred that Stanislaus producers are not included in the term ''producer,'' when that term is used in the Marin contract. It may be inferred that the interests of Stanislaus producers in the San Francisco market for milk is not sufficient to justify their contribution to a fund to promote the increased consumption of milk in that area. No good reason appears why the Marin producers should pay for such a campaign for the equal benefit of the Stanislaus area producers. This term appears to be further indicative of the fact that respondent, and the Marin producers, in contracting for the purchase and sale of milk, intended, as to those provisions (pooling) dealing with ''all other producers,'' to refer to all other producers *of the same area.*

We are convinced that the trial court erred in concluding that neither the law nor the Stabilization and Marketing Plan in San Francisco required the distributor to pay the producer the established minimum price according to the class in which the producers' milk was used. We are likewise convinced that the court erred in concluding that the contracts justified failure to pay producers the established minimum price according to the usage of the milk. As we view the matter, the provisions of the act and the stabilization and marketing plans are clear and explicit and the trial court was not justified in giving them the construction it did. The policy behind the Milk Stabilization Act is of more than local concern and the proper and uniform administration of the act is of state-wide concern. As was stated in *In re Willing, supra,* at page 594:

''The purpose of said chapter, as announced in section 735, is to eliminate economic disturbances and unfair trade practices in the milk industry which threaten both the quality and adequacy of the supply of fluid milk and cream. The section

declares that health regulations alone are insufficient to prevent disturbances which threaten to destroy and seriously impair the quality and supply of milk. Thus provisions which protect the producer by establishing a fair price to him and affording him security for payment of the price due him for milk and cream by means of a bond, are incident to the broader purpose to protect the public milk supply. Economic security to producers will tend to encourage compliance on their part with sanitary regulations and the maintenance of dairy herds sufficient to provide an adequate milk supply at reasonable prices to consumers.''

While it may be argued that the Marin producers were not deprived of anything they would have received if respondent had in fact transported milk from Stanislaus County and used it as Class 1 milk in lieu of the Marin producers' milk, yet it is not for a court to say that such practice, indulged in throughout the state, would not tend to defeat the purposes and policy of the Milk Stabilization Act and of the Stabilization and Marketing Plans. Indeed it may well be doubted whether any interpretation of the act which requires fictitious book entries purporting to show a usage that never existed in order to comply with plain and unambiguous provisions can ever be sustained. We believe that appellant is fully justified in contending that such practice as is followed by respondent in the instant case would not only violate the terms of the act and plans but would tend to defeat the purposes of milk control legislation.

Our conclusion is that both the Milk Stabilization Act and the Stabilization and Marketing Plans require that the producers furnishing the milk in a marketing area are the producers to whom the established minimum price according to usage in the area where it is sold must be paid, and that respondent must pay the producers whose milk it has actually used for Class 1 the established Class 1 price.

In view of the foregoing the judgment is reversed with directions to the trial court to enter judgment for defendant in accordance with the views herein expressed.

Nourse, P. J., and Dooling, J., concurred.

A petition for a rehearing was denied December 30, 1950, and respondent's petition for a hearing by the Supreme Court was denied January 25, 1951.